THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL R. BARGER, Defendant-Appellant.

Fourth District   No. 4—91—0656

Opinion filed November 30, 1993.

COOK, J., specially concurring.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Elliott Turpin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

After a July 1991 bench trial, the trial court convicted defendant, Michael R. Barger, of two counts of criminal sexual assault of his four-year-old daughter, G.B., in violation of section 12—13(a)(3) of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3)). The court later sentenced defendant to two consecutive five-year terms in prison. Defendant appeals, arguing that (1) the trial court erroneously admitted hearsay statements under section 115—10 of the Code of Criminal Procedure of 1963 (Procedural Code) (Ill. Rev. Stat. 1991, ch. 38, par. 115—10), (2) the State failed to prove him guilty beyond a reasonable doubt, and (3) the trial court abused its discretion in not sentencing him to probation.

We disagree and affirm.

## I. BACKGROUND

Defendant and his wife, Eva Barger, divorced in June 1990 after a nine-year marriage. Eva obtained custody of their two children— G.B. (their daughter, born August 27, 1986) and T.B. (their son, born September 10, 1984)—and defendant obtained visitation at his home in Urbana on weekends while Eva worked.

On October 29, 1990, the Monday morning after one of these weekend visitations, G.B. told Eva during breakfast at Eva's home that G.B. and defendant had a "secret." G.B. then looked down at her cereal bowl and told her mother that "daddy kissed her private parts and she kissed her daddy's penis." Eva responded by asking G.B. if she meant that they had wrestled and he had actually just blown on her stomach, to which G.B. responded, " 'No, Mommy, he kissed my private parts.' "

Eva did not ask G.B. anything more, but instead spoke to defendant when he called later that day. Eva told defendant about G.B.'s accusations, and they agreed to meet at defendant's home that night to discuss them. At this meeting, G.B. restated her allegations and defendant adamantly denied them. Concerned about her allegations, defendant walked G.B. around the house, holding her hand and asking her periodically where G.B. thought these events had occurred. Eva

and the children eventually went home without further resolving anything.

The next day, Eva phoned her pediatrician after work and was referred to Dr. Holly Mirell of Carle Clinic in Champaign. Although Eva at no time called the authorities, the Urbana police and the Illinois Department of Children and Family Services (DCFS) were both called at this time and started investigating this case. The record does not reveal who first called the authorities. Eva testified that she did not want defendant prosecuted, although she did not give any reasons.

On November 14, 1990, Bill Gordon, an investigator with DCFS, and Officer Jim Wuersch, a juvenile investigator with the Urbana police department, met with G.B. at LaPetite Academy in Champaign. G.B. told them that she knew why they wanted to speak with her and told them about the alleged incidents. She told them that she had undressed both herself and her father, taking off his jeans, shirt, green swimsuit, and underwear. She said that after they became naked "her daddy *** kissed and licked her private parts, and [at her father's request,] she *** kissed, licked and sucked her daddy's private part."

Gordon asked her where these incidents had happened, and G.B. responded that they occurred on "a couch-type bed upstairs at her daddy's house." She told them that her brother (T.B.) had gone downstairs to look for the pizza delivery man while these events occurred. T.B. returned upstairs before they had finished, but her father told him to go back downstairs. G.B. did not tell Gordon and Wuersch that anything happened downstairs; everything she described to them had occurred upstairs.

On November 19, 1990, Dr. Mary Buetow of Carle Clinic spoke to Eva and then examined and spoke to G.B. G.B. initially thought she was there to speak about a cough that had kept her awake the night before. The sexual abuse came up when Dr. Buetow asked G.B. if she remembered with whom she sat in the waiting room as Dr. Buetow spoke with Eva. G.B. responded "Bill Gordon *** the person I told about my daddy kissing my privates." Thereafter, G.B. told Dr. Buetow that her father had kissed her private parts one weekend night when she visited him at his house. Dr. Buetow asked G.B. if she remembered the room in which it happened, to which G.B. responded, "downstairs."

Dr. Buetow described what G.B. told her as follows:

"She indicated that her brother had been sent upstairs; *** that [defendant had] gone to a T.V. store and gotten two [video] tapes [(one was Godzilla and one was King Kong)] and they were watching the second of the two tapes at the time. Her

daddy was sleeping on the floor, [and] was snoring; that she took off her daddy's pants and his swimsuit, which is a bright green swimsuit; that she could not get off his shirt and that her dad himself took off his shirt; that she took off her clothes, her dad took off her underwear, and that he licked and kissed her in her private area.

\* \* \*

I [then] asked her what she had done to her father, and she indicated that she had sucked on his penis."

Dr. Buetow asked G.B. if she had ever heard about sucking genitalia on television, in a book, or from anyone else. G.B. responded that she did not and that " '[m]y dad taught me how to suck his penis.' " G.B. then demonstrated by using stuffed, anatomically correct dolls of a naked adult male and a naked female child. According to Dr. Buetow, "She first undressed the little girl doll and undressed the male doll adult, saying, 'All the clothes have to be off.' " She laid them side by side, saying " 'Here's the dad snoring.' " She then took the adult male doll, put the mouth of the doll in the female crotch, and said that it represented her father licking and kissing. Dr. Buetow asked G.B. if her father did so on the inside or the outside, and G.B. opened the vaginal opening on the doll and showed that he kissed her on the inside.

Dr. Buetow then asked G.B. what she did to her father. G.B. picked up the adult male doll, put the doll's penis in her mouth, and sucked on it. She then took the penis out of her mouth, looked at it, and asked, " 'Where's the hole that belongs here?' " Dr. Buetow responded by asking G.B. if she saw this hole on her father's penis and if anything had come out of this hole. G.B. said that she saw the hole, but nothing had come out of it.

Dr. Buetow then physically examined G.B., but did not find anything unusual. However, Dr. Buetow testified that the sexual conduct G.B. alleged had occurred ordinarily would not leave any physical evidence.

Dr. Buetow also testified that some confusion arose between her and Bill Gordon of DCFS regarding where the alleged incidents occurred. G.B. had only told Dr. Buetow that they occurred "downstairs," although G.B. had only told Gordon that they occurred "upstairs." Dr. Buetow thus asked G.B. to clarify, and G.B. said, " 'That's no problem.' " G.B. then explained that these events had first occurred "downstairs" after defendant sent T.B. up to his room, and then occurred "upstairs" after defendant sent T.B. downstairs to watch for a pizza delivery.

Based on this information, defendant was charged in December 1990 with two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(b)(1)). The first count alleged sexual penetration between defendant's mouth and G.B.'s vagina, and the second count alleged sexual penetration between defendant's penis and G.B.'s mouth. On the day before trial, the State amended the charges by information to add two counts of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(3)) based on the same acts as contained in the first two counts, but alleging in addition that the defendant was a family member.

At the bench trial, G.B. testified that when she visited defendant at his house in Urbana, she kissed him on his penis and defendant kissed and licked her "lots of times" on her vagina. She testified that these events occurred at night on the floor downstairs after they watched Godzilla and King Kong on television. She testified that she had taken off her father's jeans, shirt, green swimsuit. She added that T.B. played outside with her dog as they occurred.

After further questioning, she then added that the incidents also happened upstairs as T.B. waited downstairs for the pizza delivery. She testified that, as they laid on her brother's sofa bed, she kissed and sucked on her father's penis. She added that her father told her to keep it a secret. On cross-examination, G.B. explained that she did not feel mad at her father, but instead felt sad because "he's not living with us."

T.B. testified at trial that on the weekend in question, his father had told him to wait for the pizza delivery man downstairs as he and G.B. remained upstairs on the sofa bed. T.B. added that he went upstairs before the pizza delivery man arrived and found his father and G.B. talking as they laid on the sofa bed. When asked if they wore any clothes, T.B. stammered a bit, said he could not remember, and then said that they did. However, he clarified that G.B. only wore her shorts. When his father saw T.B., he yelled at T.B. to get back downstairs and watch for the pizza delivery.

At a separate hearing prior to trial conducted under section 115—10 of the Procedural Code (Ill. Rev. Stat. 1989, ch. 38, par. 115—10), the trial court had found that G.B.'s statements to Eva, Gordon, Wuersch, and Dr. Buetow all provided sufficient safeguards of reliability and therefore held them admissible. Thus, as previously set forth, Eva, Dr. Buetow, and Wuersch testified at trial about what G.B. said to them.

Defendant denied all charges. He testified that he had a "fantastic" relationship with both his children, and that it has not changed

since these allegations arose. G.B. still runs up to him and hugs and kisses him as before.

Regarding the events of October 27, defendant testified that he, G.B., and T.B. all went to the park to play with their dog. They went to a bakery, visited defendant's stepfather, and then walked back home to order pizza and watch a Godzilla and a King Kong video. As they waited for the pizza, G.B. started arguing with T.B. about some toys, so defendant brought G.B. upstairs to find her some different toys.

T.B. came upstairs after a short while, but defendant sent him back down to wait for the pizza delivery so the delivery man would not miss the house. On cross-examination, defendant admitted that his address was prominently displayed on his house. Defendant added that he and G.B. never took their clothes off, and that although he owned a green swimsuit, he did not wear it because it was October.

After waiting for a long time for the pizza, defendant reordered it. When it arrived, the children let the delivery man into the house while defendant was in the bathroom. He scolded them for letting a stranger in the house, but nothing remarkable happened after that.

When he spoke to Eva the next day and she told him about G.B.'s allegations, he asked them to come over to discuss them. When they arrived, he took G.B. into the kitchen and asked her when she thought he had kissed her privates. She responded "today," but defendant and Eva both shook their heads because defendant had not seen G.B. that day. G.B. then said that it happened "one day last week," but never provided a specific day.

Defendant also testified that G.B. had talked to him at least twice during the months before the alleged incident occurred about kissing, licking, and sucking people's private parts. He became very upset, but when he told Eva and Eva's mother, they both dismissed it casually as idle "kid talk."

On cross-examination, the prosecutor asked defendant if he had told Gordon and Wuersch that G.B. had slipped into his bed while naked and accidentally slipped her hand inside his shorts. Defendant first responded that he did not recall telling them that, but then added they might have asked him about it, but that he denied it. After a few more questions, he admitted that he might have said it. The prosecutor then attempted to clarify defendant's answer, but defendant again gave equivocal answers and avoided answering the question directly. Eventually, he said that he did not recall it happening.

Defendant also presented two reputation witnesses who testified that he had a good reputation and that these allegations surprised them and the others with whom they had spoken.

On rebuttal, Eva testified that defendant did mention that G.B. had hugged him while he was naked and that G.B. then had commented about his penis. Eva had responded that he should keep his clothes on when around G.B. and that, if it happened again, he should tell G.B. that his penis was his private part and that she should not get so close to it. Eva added that defendant never mentioned anything regarding G.B. talking about kissing, licking, or sucking private parts.

Wuersch then testified that during a conversation with defendant, he asked defendant if G.B. had ever accidentally touched his penis. Wuersch testified that defendant "remembered an occasion where she might have reached accidentally inside of his shorts and touched his penis." Defendant had also told them that whenever G.B. hugged him, she buried her face in his groin because of her height.

Based on this evidence, the court found defendant guilty of two counts of criminal sexual assault and later sentenced defendant to two consecutive five-year prison terms. Defendant appeals.

## II. ANALYSIS

### A. *Hearsay Statements Admitted Pursuant to Section 115—10*

Defendant first argues that the trial court erred in permitting Eva, Wuersch, and Dr. Buetow to testify about G.B.'s statements to them under section 115—10 of the Procedural Code (Ill. Rev. Stat. 1991, ch. 38, par. 115—10). That section states the following:

"(a) In a prosecution for a sexual act perpetrated upon a child under the age of 13, including but not limited to prosecutions for violations of Sections 12—13 through 12—16 of the Criminal Code of 1961, the following evidence shall be admitted as an exception to the hearsay rule:

(1) testimony by such child of an out of court statement made by such child that he or she complained of such act to another; and

(2) testimony of an out of court statement made by such child describing any complaint of such act or matter or detail pertaining to any act which is an element of an offense which is the subject of a prosecution for a sexual act perpetrated upon a child.

(b) Such testimony shall only be admitted if:

(1) The court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability; and

(2) The child either:

(A) Testifies at the proceeding; or

(B) Is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement."

For clarity, we will detail the testimony presented at the section 115—10 hearing because the trial court must determine whether the time, content, and circumstances provided sufficient safeguards of reliability based solely on the testimony presented at that hearing. See *People v. Back* (1992), 239 Ill. App. 3d 44, 47-51, 605 N.E.2d 689, 693-95.

### 1. Testimony Presented at the Section 115—10 Hearing

The State presented Eva, Gordon, Wuersch, and Dr. Buetow at the section 115—10 hearing. Eva testified about G.B.'s statement at breakfast on Monday, October 29, that she and defendant had a secret. G.B. then looked down at her cereal bowl and volunteered that "[m]y daddy kissed my private parts and I licked my daddy's penis." Eva asked if she had really just wrestled with defendant, but G.B. responded, "No, mommy. He kissed my private parts."

Gordon testified that he had worked as a child protective investigator for DCFS for five years and had spoken frequently with child victims of sexual abuse. He estimated that he works on 150 to 200 reports a year of all kinds, about 20% of which constitute "priority one" reports that usually involve sexual abuse. Gordon began working on this case as a result of a call to the DCFS hotline. He had spoken about G.B. previously to Dr. Holly Mirell, a psychologist at Carle Clinic, who had met with G.B.

Gordon met with G.B. on November 14, 1990, at her day-care center to discuss her allegations that her father had kissed her private parts and had her kiss his private parts. They spoke in the kitchen of the day-care center because that room provided them the most privacy. In speaking to G.B., Gordon testified that he asked the questions and Wuersch took notes so as to not interrupt the flow of the conversation.

Gordon told G.B. who he was and that he often spoke to children "to find out *** what's true and what's not." Gordon asked her if she knew why they wanted to speak with her, and G.B. responded that she did and that her mother had told her that they would come to speak with her. Gordon testified that he ordinarily experiences prob-

lems initiating the subject of sexual abuse, but that G.B. overcame this problem by bringing up the subject herself.

Gordon asked G.B. where the incidents occurred and for some details. Gordon testified that G.B. told them, " 'I told my mommy *** that I licked my daddy's privates.' " Gordon also testified that G.B. spoke freely with them and thus they did not need to use anatomically correct dolls to help her explain what had happened.

Wuersch next testified about this same meeting with G.B. He explained that he had worked as a police officer for 14 years and had worked on juvenile cases for 18 months, many involving sex crimes. He said he mostly took notes as Gordon asked G.B. questions. The three of them all sat on the kitchen floor on carpet pads as they spoke.

Wuersch corroborated that G.B. knew why they wanted to speak with her and that she brought the subject up without much prompting. When Gordon asked her if she knew why they wanted to speak to her, G.B. responded that she did and said that she had told her mother that she had "touched" her father's privates. She added later that "she [had] kissed and licked and sucked her father's penis, and he [had] kissed and licked her private area." Gordon asked her where her privates were, and she pointed to her vagina. He also asked her where it happened, and she responded that it happened on a sofa at her father's house in Urbana when it was dark outside.

Wuersch then detailed what G.B. told them about these incidents. She stated that she had taken both their clothes off and that her father wore a shirt, jeans, and a green swimsuit. She added that her father helped her undo his shirt buttons, and that she helped him unbutton his jeans and then unzipped them. She also added that she removed his cowboy boots. After she undressed, her father first kissed her privates. When Gordon asked G.B. how many times her father kissed her privates, G.B. merely responded, "One day." G.B. also later told them that she had choked while she sucked on her father's penis. Gordon asked her if her father's penis was erect when this happened, using spaghetti before and after cooking and a balloon before and after someone blows it up as examples, but none of these examples worked. She ended up saying that "it just hangs down."

Gordon asked her where T.B. was as these incidents occurred, and she responded that T.B. was waiting "for a pizza man." Gordon did not understand what G.B. meant, and eventually asked her what she meant. She explained that they had ordered a pizza and T.B. waited downstairs for the delivery so that the delivery man would not miss the house. Gordon asked her if T.B. came upstairs during this time,

and she responded that he did, but her father told T.B. to go back downstairs.

Gordon asked her where she slept when she visited her father, and she responded that she and T.B. slept with her father because he had only one bed. G.B. further explained that she slept in pajamas at her mother's house, but slept in her underwear at her father's house because her father told her to do so.

Gordon also asked G.B. if she knew the difference between the truth and a lie, and G.B. told them that she did. When he asked if she had told them the truth or a lie, G.B. became "aggressive and upset" that they accused her of telling a lie. She insisted that she had told them the truth.

Dr. Buetow testified next about her conversation with G.B. She first testified that she has worked as a licensed pediatrician since 1954 and currently works at Carle Clinic in Champaign as a part of a child protection team that evaluates allegations of child abuse or neglect. Prior to meeting with G.B., she received a brief history that G.B. had told her mother about a "secret" with her father that he had kissed and sucked on her privates and G.B. had done the same to him.

On November 19, 1990, Dr. Buetow spoke separately to Eva and then G.B. After asking G.B. her name, age, and where she went to school, Dr. Buetow asked G.B. if she knew why Dr. Buetow wanted to speak to her. G.B. responded that she had a cold. Because Gordon had waited with G.B. as Eva spoke to Dr. Buetow, Dr. Buetow asked G.B. about Gordon and why she knew Gordon. G.B. then told Dr. Buetow that she had talked to Gordon "about 'kissing my daddy's private parts' " in her father's house when she went to visit her father. Dr. Buetow asked her where that happened, and G.B. responded that it happened "downstairs" on the floor as they watched a Godzilla and King Kong movie on television.

G.B. explained that she remembered her father snoring as he slept on the floor. She then removed his pants and his green swimsuit. The prosecutor asked Dr. Buetow if defendant had asked G.B. to do so, but Dr. Buetow responded, "She did it by herself." However, Dr. Buetow added that when G.B. tried to unbutton defendant's shirt, she could not undo the buttons by herself, so her father unbuttoned his shirt. G.B. then took her overgarments off, and her father removed her underwear.

G.B. continued that " '[h]e kissed and licked it down there,' *** referring to her vaginal area" by pointing. Dr. Buetow then asked G.B. to use anatomically correct dolls of a naked female child and a

naked adult male to demonstrate what happened. G.B. noted that her daddy had a mustache and that the doll did not. G.B. then took the clothes off the male doll, saying that they needed to be off. She laid the male doll down and said, " 'Here's daddy laying here snoring.' " She then sat the male doll up, leaned the doll over, and put its mouth on the genitalia of the female doll. In response to Dr. Buetow's question, G.B. opened the labia on the female doll's vagina and stated that he kissed and licked her on the "inside."

After that, instead of using the female doll on the male doll, G.B. herself picked up the male doll and placed the penis of the male doll in her own mouth. She then pulled it out and asked, " 'Where's the hole that belongs here in the middle?' " Dr. Buetow did not respond, but instead asked G.B. if she remembered anything coming out of this hole. G.B. said that nothing came out.

Dr. Buetow pointed to the female doll's buttocks and asked G.B. if her father ever touched her there. G.B. said he did not. Dr. Buetow asked G.B. if defendant said anything during these incidents, but G.B. did not recall if he had. G.B. also told Dr. Buetow that T.B. slept upstairs as these events occurred downstairs.

Dr. Buetow then tried to determine if something or someone had suggested or taught these things to G.B. However, in response to Dr. Buetow's questions, G.B. said that she had never heard of anyone sucking or kissing private parts except for her and her father and that she never saw anything like it on television or in a movie. G.B. did mention that another boy at daycare had exposed his penis to her one day, and that a "teacher" had scolded the boy for doing so, but added that nothing else happened.

Dr. Buetow then asked G.B. about how she felt about her father. G.B. explained that her parents had fought a lot, but then her father moved to Urbana. G.B. explained that she wanted her father to move back home with her, but that her father considered her mother a poor mother. Dr. Buetow ended the interview by impressing upon G.B. the importance that she tell the truth. She then asked G.B. if she had told the truth, and G.B. responded that she had.

Dr. Buetow also testified that while discussing the matter with Gordon, they noted that G.B. had told Gordon that these incidents happened upstairs on the sofa but had told Dr. Buetow that they happened downstairs on the floor. Dr. Buetow thus asked G.B. about this confusion, and G.B. responded, " 'That's no problem. We first did it downstairs and then we went upstairs.' "

On cross-examination, defense counsel asked Dr. Buetow about a controversy over using anatomically correct dolls in helping child vic-

tims of sex abuse demonstrate what happened to them. Dr. Buetow clarified that the only controversy about which she knew pertained to giving the dolls to the children without any instructions and allowing them to play with the dolls as a psychologist or therapist observes. The controversy arose because that practice allows too much room for inaccurate interpretation by the observing psychologist. Dr. Buetow then clarified that no such controversy exists over asking the child victim specifically to demonstrate what he or she cannot fully explain with words. Although G.B. did speak freely and knew some of the proper vocabulary, Dr. Buetow said that the dolls helped G.B. show what she meant when she stated that she sucked on her daddy's privates and that her daddy licked and kissed her privates.

At the end of the hearing, defense counsel focused on certain factors that allegedly undermined the reliability of G.B.'s statement. First, counsel emphasized that G.B. reported a very limited amount of details when she first spoke to her mother, and that she revealed more details as she reported these incidents to more people. Counsel used this growing level of details to indicate that someone had coached G.B. Second, counsel argued that the fact that G.B. repeated the very same details to several people also indicated coaching. Counsel admitted, however, that this case presented a "close" call between verbatim coaching and simply accurately recalling the same set of facts several times. Third, counsel noted that G.B.'s mother had already taught her the appropriate terms for sexual organs, thereby dismissing any inference that might otherwise stem from a child's use of vocabulary uncommon for a child of four.

Defense counsel also objected to the cumulative prejudicial effect of presenting so many witnesses with essentially the same story. In response, the trial court appropriately noted that this factor has nothing to do with the reliability of G.B.'s statements and therefore is irrelevant for purposes of the section 115—10 hearing.

Based on the above evidence, the trial court made the following comments at the end of the section 115—10 hearing:

> "In my view, the question as to the statements made to Wuersch and Gordon *** and [to] Dr. Buetow *** bear[s] a bit more scrutiny because of the timing. Clearly, this [sic] was an opportunity for the child to discuss with other persons *** the content of her statements; however, giving due regard to that, giving due regard to the age of the child and the other circumstances which have been described, it's my view that each of the three statements qualifies for treatment under 115—10 so as to be admitted."

## 2. Analysis

### a. Standard of Review

In *People v. Deavers* (1991), 220 Ill. App. 3d 1057, 1069, 580 N.E.2d 1367, 1375, this court held that a trial court's determination that out-of-court statements under section 115—10 of the Code were admissible would not be overruled unless that decision was "contrary to the manifest weight of the evidence." Similarly, the Fifth District Appellate Court held that this standard of review applies to section 115—10 cases. *People v. McMillan* (1992), 231 Ill. App. 3d 1022, 1031, 597 N.E.2d 923, 928.

■ However, since *Deavers* and *McMillan*, the supreme court has stated that the standard of review of a trial court's decision to admit hearsay statements under section 115—10 of the Procedural Code does not differ from the standard of review generally applied to a trial court's decision on the admissibility of any evidence. (*People v. Zwart* (1992), 151 Ill. 2d 37, 44, 600 N.E.2d 1169, 1172.) In *Zwart*, the supreme court characterized a trial court's finding pursuant to section 115—10 as an ordinary evidentiary question and further stated that "questions regarding the admissibility of evidence lie within the discretion of the circuit court. A reviewing court may overturn a trial court's determination only when the record clearly demonstrates that the court abused its discretion." (*Zwart*, 151 Ill. 2d at 44, 600 N.E.2d at 1172.) Thus, we decline to apply the standard of review set forth in *Deavers* and *McMillan* and instead will apply the supreme court's standard set forth in *Zwart*.

### b. Section 115—10 Hearsay

■ Initially, we note that the Second District Appellate Court in *People v. West* (1992), 234 Ill. App. 3d 578, 587, 598 N.E.2d 1356, 1362, reversed a trial court's holding that the hearsay statements in that case were admissible under section 115—10 of the Procedural Code because the trial court did not specify its reasons for so holding. Although we agree that trial courts should preferably state their reasons for any evidentiary ruling, we disagree that a trial court's failure to do so deprives an appellate court of the ability to review the record and to determine whether the trial court abused its discretion in ruling that certain hearsay statements are admissible under section 115—10. Therefore, although we find helpful the trial court's brief explanation of its ruling, as quoted above, we would not reverse this

case on the *sole* ground that either the court did not sufficiently explain its ruling or that the court provided no explanation at all.

As noted in several previous cases, admitting hearsay statements denies a defendant the opportunity to cross-examine the out-of-court declarant, thereby implicating the defendant's right to confront the witnesses against him. (See *West*, 234 Ill. App. 3d at 585-88, 598 N.E.2d at 1361-63; *People v. Coleman* (1990), 205 Ill. App. 3d 567, 579-84, 563 N.E.2d 1010, 1018-21.) Therefore, the standards regarding the right to confrontation provide guidance on how to interpret the requirement of section 115—10 of the Procedural Code that the trial court find that the time, content, and circumstances of the hearsay statements provide sufficient safeguards of reliability.

In *Idaho v. Wright* (1990), 497 U.S. 805, 814, 111 L. Ed. 2d 638, 651-52, 110 S. Ct. 3139, 3146, the United States Supreme Court held that incriminating hearsay statements made by a child victim of sexual abuse must meet two requirements before they are admissible: (1) in the usual case, the prosecution must either produce the declarant or demonstrate the declarant's unavailability; and (2) the statement must bear adequate "indicia of reliability." Such "indicia of reliability" can come from the statement's fitting into one of the firmly established hearsay rules or by "a showing of particularized guarantees of trustworthiness." *Wright*, 497 U.S. at 816, 111 L. Ed. 2d at 653, 110 S. Ct. at 3147.

The Court concluded that "the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." (*Wright*, 497 U.S. at 819, 111 L. Ed. 2d at 655, 110 S. Ct. at 3148.) In particular, a court should not consider corroborating evidence when evaluating the facial reliability of the hearsay statements, but should solely evaluate the circumstances when the child-declarant made the statements. (*Wright*, 497 U.S. at 822, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.) The Court listed some factors to consider when determining the reliability of such hearsay statements, including, but not limited to, (1) spontaneity and consistent repetition, (2) the mental state of declarant, (3) use of terminology unexpected of a child of a similar age, and (4) lack of motive to fabricate. *Wright*, 497 U.S. at 821-22, 111 L. Ed. 2d at 656, 110 S. Ct. at 3150.

In *Coleman*, this court held the following regarding *Wright*'s impact on section 115—10 of the Procedural Code:

"[T]he required finding [under section 115—10(b)(1)] that the statement provides 'sufficient safeguards of reliability' must be understood to be of a comparable nature with a finding that the

circumstances of the statement render the declarant 'particularly worthy of belief' and, in reaching this decision, the court must consider only those circumstances which surround the making of the statement." *Coleman*, 205 Ill. App. 3d at 584, 563 N.E.2d at 1021.

In this case, defendant argues that the timing and content of the statements did not provide sufficient safeguards of reliability such that G.B.'s statements are particularly worthy of belief. Defendant makes the same arguments on appeal that he did at trial, namely, that G.B. provided more details as she spoke to more people. Defendant explains as follows:

"[G.B.] seemed to have a 'pat' response to every question which was raised by the investigators or Dr. Buetow. There is something about the description of her complaints that causes one to pause and reflect as to whether the complaints are valid or whether they were invented in the mind of a four-year-old [child]."

Besides noting that G.B. reported the same facts in growing detail as she spoke to more people, defendant does not explain what this "something" is that "causes one to pause." Defendant argues nonetheless that "it is incumbent that this court reverse [defendant's] convictions and remand for a new trial." We disagree.

■ In reviewing the record, we find in G.B.'s statement only the level of consistency we would expect to find when someone with a limited vocabulary recalls past events. Moreover, G.B.'s level of consistency falls far short of a person's repeating verbatim answers that would be suggestive of coaching. Further, defendant does not suggest anyone who might have coached G.B. The only person whom one might initially suspect—defendant's ex-wife and G.B.'s mother (Eva)—never reported the incident to the authorities and reluctantly admitted that she did not even want defendant prosecuted for his alleged sexual misconduct with her daughter.

Furthermore, the problems defendant cites regarding G.B.'s statements do not outweigh the other indicia of their reliability, including, but not limited to, that G.B. (1) first made these statements without any prompting, (2) continued insisting that the events at issue occurred even though her mother did not want defendant prosecuted, (3) bore no animus toward her father and wanted him to live with them, and (4) did not automatically accuse defendant of other types of sexual conduct even when specifically asked by Gordon and Dr. Buetow. These factors impacting on the time, content, and circumstances of C.L.'s allegations all provided sufficient safeguards of relia-

bility. Therefore, we do not find that the trial court abused its discretion in permitting the State's witnesses to testify under section 115—10 of the Procedural Code to G.B.'s hearsay statements.

In *People v. Fowler* (1992), 240 Ill. App. 3d 442, 608 N.E.2d 390, the First District Appellate Court addressed the defendant's argument that the trial court improperly admitted hearsay statements of the seven-year-old victim under section 115—10 of the Procedural Code. The first district reversed the defendant's conviction and remanded for a new trial, holding that the trial court erred by permitting a police officer to testify beyond what section 115—10 permits as an exception to the hearsay rule. (*Fowler*, 240 Ill. App. 3d at 450-51, 608 N.E.2d at 396.) The first district explained its reasoning as follows:

> "[The officer] testified not only about what the victim had told him about the incidents in question. He also testified about physical gestures she made during the interview so that he was able to describe the acts with details not provided by the victim. We find that this portion of [the officer's] testimony was improper and prejudicial." *Fowler*, 240 Ill. App. 3d at 451, 608 N.E.2d at 396.

In the present case, we note that a witness (Dr. Buetow) testified about how G.B. used anatomically correct dolls to demonstrate how she performed fellatio on defendant. Given our earlier determination that the trial court properly ruled Dr. Buetow's testimony about G.B.'s hearsay statements admissible, we hold that her description of G.B.'s actions and gestures was equally admissible and properly received in evidence. We decline to follow the first district's distinction between nonverbal and verbal communication in the context of a section 115—10 analysis. Indeed, we know of no context where that distinction is legitimate. Accordingly, we hold that nonverbal as well as verbal communication falls under the exception to the hearsay rule contained in section 115—10 of the Procedural Code.

In the hearsay context, courts have frequently held that nonverbal communication constitutes hearsay under the same circumstances as would verbal communication. (See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.2, at 572 (5th ed. 1990) ("Nonverbal conduct may on occasion clearly be the equivalent of an assertive statement, that is, done for the purpose of deliberate communication, and thus classified as hearsay").) For instance, if a police officer in a murder case asked a witness, "Who killed the victim?", there would be no difference under the law between the witness' pointing to the defendant, on the one hand, and the witness' saying, "The defendant

did it," on the other. Both would constitute hearsay if offered at the ensuing trial to prove that the defendant killed the victim.

We see no reason why nonverbal communication that constitutes hearsay testimony should not fall within the exception to the hearsay rule contained in section 115—10 of the Procedural Code. Indeed, gestures and demonstrations by a child victim might provide the *most* accurate and reliable portion of that child's statement, if not the child's most vivid recollection. Just as these nonverbal demonstrations constitute hearsay if offered to prove the matter asserted in the demonstrations, they also fall under the section 115—10 exception to the hearsay rule if their time, content, and circumstances provide sufficient safeguards of reliability.

In so holding, we note that another division of the First District Appellate Court has held that a child victim of sexual abuse may use anatomically correct dolls when testifying at trial to demonstrate what happened. (See *People v. Roman* (1992), 260 Ill. App. 3d 436, 445-46.) Although the issue was not before it, the *Roman* court went out of its way to add the following: "Courts have also held that the testimony of witnesses concerning a complainant's use of anatomically correct dolls to demonstrate sexual abuse during out-of-court interviews is admissible." (*Roman*, 260 Ill. App. 3d at 445-46.) We agree with the holding in *Roman* and decline to follow *Fowler*.

■■ Finally, we note that the trial court specifically stated, "In viewing all of the evidence, standing alone, the child's testimony would be sufficient to find the Defendant guilty of the offenses charged." Therefore, although we hold that the trial court did not err in admitting the hearsay statements pursuant to section 115—10 of the Procedural Code, we conclude that any error would have been harmless.

### B. *Sufficiency of the Evidence*

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt of criminal sexual assault because G.B. gave varied versions of the events in question. The Illinois Supreme Court has recently stated the following standard for reviewing the sufficiency of the evidence:

> "When faced with a challenge to the sufficiency of the evidence, the reviewing court applies the reasonable doubt standard as set forth in *People v. Collins* (1985), 106 Ill. 2d 237, 261[, 478 N.E.2d 267, 277]. This standard, derived from *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560,

573, 99 S. Ct. 2781, 2789, does not require the court to ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." ' (Emphasis in original.) [Citations.] [Instead,] the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261[, 478 N.E.2d at 277; citation].) *** The standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' (*Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789; [citation].)" (*People v. Campbell* (1992), 146 Ill. 2d 363, 374-75, 586 N.E.2d 1261, 1265-66.)

Therefore, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses, and will not reverse a criminal conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Campbell*, 146 Ill. 2d at 375, 586 N.E.2d at 1266; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277.

■ When viewed in the light most favorable to the prosecution, the record contains more than enough evidence to convict defendant. Although defendant details in his brief some minor inconsistencies in G.B.'s testimony, we agree with the trial court that, "[B]y and large, *** the narrative [G.B. provided] was a consistent narrative from the first account to her mother through the account to Mr. Gordon and Officer Wuersch and also to Dr. Buetow."

The trial court also noted that it did not believe defendant, noting that he had feigned forgetfulness and dodged questions regarding whether G.B. had ever accidentally slipped her hand in his shorts. The court also noted that defendant lied about the conversation with Eva in which he claimed that he complained to Eva about G.B.'s talking about licking and sucking genitalia. Eva's testimony made it clear that he said no such thing. Accordingly, we reject defendant's challenge to the sufficiency of the evidence.

### C. *Sentencing*

Defendant cites section 5—5—3(e) of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3(e) (family member convicted of criminal sexual assault can be sentenced to probation under certain limited circumstances)) and next argues that the trial

court abused its discretion by not sentencing him to probation and instead sentencing him to two consecutive prison terms where each exceeded the minimum prison penalty. Defendant emphasizes that he has graduated from high school, become a skilled electrician, committed no crimes more serious than traffic offense, loved his children, and tried (albeit unsuccessfully) to keep up with his child support obligations when he could find work. Defendant also emphasizes that two agencies had found him to be alcohol dependent and one agency found him to be cannabis dependent; therefore, defendant argues that he would benefit greatly from treatment pursuant to probation. Accordingly, defendant argues that "this court must find that to refuse [defendant] probation in this case and then to impose consecutive sentences above the minimum allowed by statute was an [abuse of] discretion."

■ The sentencing judge has sole discretion to impose an appropriate sentence, and a reviewing court will not reverse or modify a sentence absent an abuse of that discretion. (*People v. McDade* (1991), 219 Ill. App. 3d 317, 330, 579 N.E.2d 1173, 1183; *Back*, 239 Ill. App. 3d at 80, 605 N.E.2d at 712-13.) The prison sentence imposed fell within the statutory guidelines. We therefore do not find that the trial court abused its discretion in imposing the sentence that it did. Despite the factors defendant cited as making him a good candidate for probation, the trial court thought probation inappropriate, and we do not find that the trial court abused its discretion by so holding.

Citing *People v. Leckrone* (1985), 134 Ill. App. 3d 978, 983, 481 N.E.2d 343, 347, defendant also argues that the trial court improperly considered his lack of remorse in rejecting his request for probation. In *Leckrone* (134 Ill. App. 3d at 983, 481 N.E.2d at 347), this court held "it is no more acceptable for a court to punish a defendant's lack of remorse than to punish his insistence on his innocence."

However, in *McDade*, we recently indicated our doubt over this conclusion in *Leckrone* when we wrote the following:

"The supreme court *** in *People v. Ward* (1986), 113 Ill. 2d 516, [527-28,] 499 N.E.2d 422, [425-27,] declined to follow *Leckrone* and stated a trial judge must consider all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and every aspect of his life relevant to the sentencing proceeding." *McDade*, 219 Ill. App. 3d at 331, 579 N.E.2d at 1183.

We now reaffirm our holding in *McDade* and expressly overrule *Leckrone* to the extent that it holds that a trial judge at the sentencing hearing may not consider a defendant's lack of remorse. Because

a defendant can legitimately continue under some circumstances to insist on his innocence, a trial court should not "automatically and arbitrarily" consider a defendant's so insisting as an aggravating factor when sentencing him. (*People v. Ward* (1986), 113 Ill. 2d 516, 529, 499 N.E.2d 422, 427.) However, under other circumstances, that continued insistence and defendant's concomitant lack of remorse "may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society." (*Ward*, 113 Ill. 2d at 528, 499 N.E.2d at 426.) These latter circumstances might well include the unshaken credibility of the victim or a defendant's highly dubious version of events.

In addition, a defendant maintaining his innocence at the sentencing hearing places serious doubt upon his willingness to undergo treatment for any character deficiencies that might have contributed to his criminality. In the present case, defendant maintained that he did not abuse G.B., but nonetheless said he would undergo therapy to solve this problem *if he had it*. Not surprisingly, this posture struck the trial court oddly, and it said so when it denied defendant probation. Thus, here, the trial court appropriately considered defendant's continued protestations of innocence at his sentencing hearing.

In concluding that the trial court did not abuse its discretion in sentencing defendant in this case, we have found instructive the remarks of the United States Supreme Court in *United States v. Dunnigan* (1993), 507 U.S. ____, 122 L. Ed. 2d 445, 113 S. Ct. 1111, where the Supreme Court rejected the defendant's argument that the constitution prohibited enhancement of defendant's sentence under United States Sentencing Commission, Guidelines Manual section 3C1.1 (Nov. 1989), if the Court finds the defendant committed perjury at trial. In so holding, the Supreme Court wrote the following:

> "[T]he enhancement provision is part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved. The commission of perjury is of obvious relevance in this regard, because it reflects on a defendant's criminal history, on her willingness to accept the commands of the law and the authority of the court, and on her character in general. * * *
>
>          * * *
>
> Respondent cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury. * * *

* * *

*** It is rational for a sentencing authority to conclude that a defendant who commits a crime and then perjures herself in an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process. The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *Dunnigan*, 507 U.S. at ____, 122 L. Ed. 2d at 453-55, 113 S. Ct. at 1116-18.

III. CONCLUSION

For the reasons stated, we affirm defendant's convictions and sentence.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE COOK, specially concurring:

If the hearsay rule is a useless anachronism then it should be abolished in all cases, not just those involving the sexual abuse of children. If there is some value to the hearsay rule then we should be cautious in abandoning it, even in cases involving the sexual abuse of children.

The major reason some statements are not rendered inadmissible by the hearsay rule is that because of the particular circumstances cross-examination is unnecessary.

"In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." (*Wright*, 497 U.S. at 820, 111 L. Ed. 2d at 655, 110 S. Ct. at 3149.)

The confrontation clause is not always violated by the admission of out-of-court statements which do not fit within a "firmly rooted" hearsay exception, but such statements do not come in as a matter of course. Where the evidence does not fall within a "firmly rooted" hearsay exception "the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Ohio v.*

*Roberts* (1980), 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539.

> "Because evidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception, see *Roberts, supra,* at 66, we think that evidence admitted under the former requirement must similarly be so trustworthy that adversarial testing would add little to its reliability. [Citations.] Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Wright,* 497 U.S. at 821, 111 L. Ed. 2d at 656, 110 S. Ct. at 3149-50.

What was it here about the victim's statement to her mother on October 29 which provided a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial? The State does not attempt to argue that the statement was a spontaneous declaration. "A five-day interval between the startling event and the victim's statements would generally destroy the spontaneity of those statements." (*Zwart,* 151 Ill. 2d at 48, 600 N.E.2d at 1173.) What was it about the child's statements to the juvenile police officer on November 14, or to the child-protection-team pediatrician on November 19 which made them so trustworthy that adversarial testing would add little to their reliability? The November 14 and 19 statements were made in preparation for trial, not for purposes of medical diagnosis or treatment. (See Ill. Rev. Stat. 1991, ch. 38, par. 115—13.) A psychologist at Carle Clinic, Dr. Holly Mirell, met with the child the day after the allegations were made, and spoke to DCFS investigator Gordon before November 14, but Dr. Mirell was not called as a witness. That failure itself is significant. The State should introduce evidence of all the child's interviews regarding sexual abuse, because without such evidence, it is impossible for the trial court to determine whether the victim was questioned in a suggestive manner or was encouraged to accuse the defendant of sexual abuse. See *Zwart,* 151 Ill. 2d at 44-45, 600 N.E.2d at 1172; *cf. Back,* 239 Ill. App. 3d at 54-56, 605 N.E.2d at 696-98 (not mandatory to call as a witness first person to whom 10-year-old victim reported sexual assaults).

The majority opinion relies upon the following to justify admission of the various hearsay statements:

> "Furthermore, the problems defendant cites regarding G.B.'s statements do not outweigh the other indicia of their reliability,

including, but not limited to, that G.B. (1) first made these statements without any prompting, (2) continued insisting that the events at issue occurred even though her mother did not want defendant prosecuted, (3) bore no animus toward her father and wanted him to live with them, and (4) did not automatically accuse defendant of other types of sexual conduct even when specifically asked by Gordon and Dr. Buetow." (251 Ill. App. 3d at 463.)

I respectfully suggest that these indicia are insufficient to affirmatively show the statements are worthy of reliance at trial. The statements to the mother certainly do not qualify under the spontaneous declaration exception to the hearsay rule, and we must rely on the mother in order to determine the extent of prompting before the child made the statements. The fact that the statements continued cannot be considered unusual in light of the repeated questioning of the child. The fact the victim bore no animus toward defendant is equally consistent with the argument the events never occurred. A victim coached to give a story (or convinced that certain events occurred) would not likely expand that story to other sexual conduct. These four factors provide little assurance of truthfulness; they cannot be enough for admission unless out-of-court statements of a child sex abuse victim should always be admissible.

In this case there is a very recent bitter divorce, a mother who, whatever her motive, apparently initiated these proceedings through her pediatrician, and there is no physical evidence. There is a four-year-old victim who is unusually comfortable testifying, whose mother has spoken to her about terminology, a victim who has seen a penis at school (and has a six-year-old brother). The victim does not understand what an erection, or ejaculation, is. There is no indication the conduct happened more than once, nor is there any indication defendant had these tendencies during his nine-year marriage. The majority opinion rejects defendant's arguments the victim had pat answers and that the mother might have coached the victim. It is not defendant's burden to show the evidence is untrustworthy, however. Rather it is the State's burden to show "declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." (*Wright*, 497 U.S. at 820, 111 L. Ed. 2d at 655, 110 S. Ct. at 3149.) There is nothing extraordinary about the circumstances surrounding the child's out-of-court statements here. The State failed to sustain its burden to admit the statements under section 115—10 of the Procedural Code.

*Wright* makes it clear the admission of out-of-court statements does not violate the confrontation clause when there is some necessity that they be admitted. (*Wright*, 497 U.S. at 814, 111 L. Ed. 2d at 651, 110 S. Ct. at 3146.) Why was it necessary to admit any out-of-court statements in this case? The victim testified freely and fully in open court. This is not a case where the child was unable to testify because of fear, inability to communicate in the courtroom setting, or incompetence. (*Coleman*, 205 Ill. App. 3d at 583, 563 N.E.2d at 1020, quoting *People v. Rocha* (1989), 191 Ill. App. 3d 529, 539, 547 N.E.2d 1335, 1341-42.) The only purpose for the hearsay testimony in this case was so that the State could repeat and emphasize favorable testimony, and that has never been considered a reason for admission of testimony. Three witnesses testified to hearsay in this case, but there is no reason there could not have been 13. Routine admission of such hearsay testimony allows a prosecutor to send a child victim to one potential witness after another, until the child victim gives the desired testimony. The State may select the witnesses the child speaks to on the basis of those witnesses' past effectiveness in court. Constant repetition of the events may destroy any possibility that an accurate version will be given when the child finally testifies. Persistent questioning will destroy the spontaneity of a statement (*Zwart*, 151 Ill. 2d at 48, 600 N.E.2d at 1174), and a four-year-old child is particularly susceptible to suggestion from outsiders (*Zwart*, 151 Ill. 2d at 45, 600 N.E.2d at 1172).

Section 115—10 of the Procedural Code does not condition admission of out-of-court statements on unavailability of the child victim. The statements may also be admitted if the child "[t]estifies at the proceeding" (Ill. Rev. Stat. 1991, ch. 38, par. 115—10(b)(2)(A)), but mere presence at trial has not been considered to justify admission of hearsay in other cases. " ' "[T]he presence or absence in court of the declarant of the out-of-court statement is *** irrelevant to a determination as to whether the out-of-court statement is hearsay." ' " (*People v. Velasco* (1991), 216 Ill. App. 3d 578, 584, 575 N.E.2d 954, 958, quoting *People v. Lawler* (1991), 142 Ill. 2d 548, 557, 568 N.E.2d 895, 899, quoting M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 564-65 (5th ed. 1990).) It may be necessary to use a child's out-of-court statements where a child is unavailable, but it cannot be necessary to use those statements where the child testifies freely at the hearing.

I conclude the trial court erred in considering the child's out-of-court statements. Nevertheless, this was a bench trial, the trial court heard the child's testimony and was entitled to find defendant guilty

of the offenses charged on the basis of that evidence. Although there may be concern whether testimony at trial has been tainted by what occurred prior to trial, I agree with the majority opinion that any error here in admitting the hearsay statements pursuant to section 115—10 would have been harmless.