NO. 4-02-0623

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,

          Plaintiff-Appellee,

          v.

HENRY L. MILES,

          Defendant-Appellant.

)

)

)

)

)

)))

Appeal from

Circuit Court of

Sangamon County

No. 01CF628

 

Honorable

Steven H. Nardulli,

Judge Presiding.

JUSTICE APPLETON delivered the opinion of the court:

In a bench trial, the trial court found defendant, Henry L. Miles, guilty of one count of predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 1998)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1998)).  The latter offense merged into the former, and the court sentenced him to six years' imprisonment.  

Defendant appeals on the ground that the trial court erred in admitting hearsay statements of the alleged child victim, C.M.  Despite our deferential standard of review, we agree with that contention.  Because the verdict depended so heavily on the credibility of witnesses, the error was not harmless.  We therefore reverse the judgment and remand this case for a new trial.

I. BACKGROUND

A. The Charges

On June 29, 2001, the State filed a criminal complaint and on August 23, 2001, a superseding indictment.  All three counts of the indictment charged defendant with sexually violating C.M. on November 12, 1999.  Counts I and II charged predatory criminal sexual assault (720 ILCS 5/12-14.1(a)(1) (West 1998))--penetration of the anus and vagina, respectively, with his finger.  Count III charged aggravated criminal sexual abuse (720 ILCS 5/12-16(c)(1)(i) (West 1998)) in that he touched C.M. for sexual arousal or gratification.

B. The Section 115-10 Hearing

On January 31, 2002, the trial court held a section 115-10 hearing, in which the State called two witnesses:  C.M.'s mother, Shalores M., and a sheriff's detective, Leah Boston.  

Shalores testified that defendant was a friend of the family and her mother's "boyfriend."  They called him "Mr. Mickey."  In the early evening of November 12, 1999, defendant came to Shalores's house for a visit and told her he was going to the store.  After he left in her mother's car, Shalores learned he had taken along three-year-old C.M. and another child, Natalia.  He returned an hour later with the children, and C.M. had a can of soda in her hand.  As "everybody [knew]," Shalores forbade her children to drink soda.  Shalores noticed C.M. "had a sad look on her face.  *** [S]he looked bothered."    

Soon after defendant left for the evening, "C.M. *** complain[ed] about her bottom hurting."  Shalores testified she put C.M. in the bathtub, and as soon as her bottom touched the water, C.M. began screaming.  Her buttocks and "genital area" appeared to be "real red and irritated[-]looking."  Shalores asked her, "['W]hy are you screaming?  Why is your butt hurting like this?'"  C.M. replied "that Mr. Mickey [had] scratched her."   Shalores denied asking C.M. "any other questions."  She merely "got her out of the tub and *** waited for a ride" from her friend, Jo Elle Waters.  Waters was "coming by anyway," and "when she showed up," Shalores asked her to take her and C.M. to the hospital.  En route, Shalores refrained from asking C.M. for more information.  "[I]f it were *** a fact that something happened, I didn't want them to think I [had] coaxed my child," she testified.  

At the hospital, Shalores "just assumed that [her mother, Trudy Hopkins, had been] giving [C.M.] bubble baths *** and maybe bubbles [were] irritating her."  The doctor "agreed[] and *** gave her cream."  C.M. had suffered from an irritation like this before.  Shalores testified, however, that as the doctor was filling out the discharge papers, she "called the doctor--the nurse outside[,] [into the hallway,] and told them to ask [C.M.] why she was hurting."  They asked C.M. that question, and C.M. replied, "'Mr. Mickey scratched me.'"  

Shalores testified a social worker then came on the scene "and talked to [C.M.] as well."

On cross-examination, Shalores admitted it was possible that the sad expression on C.M.'s face when C.M. returned from the store with defendant was an expression "of guilt in that she knew she wasn't supposed to have soda."

Defense counsel tried to elicit from Shalores a more detailed account of what C.M. had told her.  Shalores remembered C.M.'s telling her that defendant had "scratched" her in the backseat of "Grandma's car," but Shalores did not recall asking C.M. "how it happened" or any other follow-up questions.  Defense counsel asked Shalores:

"Q. Do you recall telling Dr. [Victoria] Nichols-Johnson that you asked [C.M.] who would do such a thing[,] that is, *** make her bottom hurt, and that [C.M.] responded, *** 'Mr. Mickey would not do it[]' ***?

A. Yeah.

Q. So, when did [C.M.] tell you that [']Mr. Mickey would not do it,['] referring to hurting her butt?

A. I can't remember if it was before *** I put her in the tub or when I got her out, but I actually forgot about that, blocked it out.

Q. You blocked that statement of hers out?

A. I blocked a lot of this out.

* * *

Q. What was it that prompted that statement from her [that 'Mr. Mickey would not do it']?  In other words, what did you say to her before she made that statement?

A. I don't remember.  I don't remember."

On redirect examination, the prosecutor asked Shalores:

"Q. Do you recall being at the hospital and *** someone['s] asking [C.M.], 'Who would do this to you?'  Do you remember anything like that being said?

A. I can't remember if the nurse or the doctor asked her that, but, yes, I do remember that.  

Q.  Do you remember how she responded, or her initial response--her first response was?

A.  I can't remember, [be]cause they've asked her that question so many times.  I don't remember."

Shalores insisted, however, that C.M. "brought Mr. Mickey's name up herself.  I never brought his name up to her, she brought the name up."

Boston testified she interviewed C.M. on November 16, 1999, but neither audiotaped nor videotaped the interview.  Boston asked her "if anyone had done anything bad to her," and C.M. nodded yes.  Boston testified as follows:

"A. *** I asked her if Mr. Mickey had done anything to her.  I asked if Mr. Mickey had touched her.

Q. All right.  How did she respond to that?

A.  She said that he touched her butt.  Or, at one point in time, she said, ['H]e scratched my butt.[']  I don't recall, specifically, right at this time, which time she said that."

Using a doll, Boston asked her "to show us what had happened."  C.M. "turned the female doll over on its stomach and inserted an index finger into the anus of the female doll, up to the second knuckle.  ***  She said something to the effect [of] [']he put it in right here.  He stuck it in right here, like this, or he put it in like this.[']"  Because C.M. told her she had a dress and pants on, Boston "asked her how he could do that over her underwear."  C.M. merely "leaned forward and pointed to the back waist of her clothing."

According to Boston, Natalia was unable to corroborate C.M.'s story.

The trial court found that "[t]he time[,] content[,] and circumstances of the statements, both to Shalores M[.] and Leah Boston, provide[d] sufficient safeguards of reliability."  The court detected no "motive of bias on the part of the child" and did not consider the questions Boston asked her to be "improperly suggestive."  

B. The Trial

On April 8, 2002, the State called five-year-old C.M. as its first witness in the bench trial.  The prosecutor asked her:

"Q. [W]hat was the name that you called Grandma's friend?

A. Mr. Mickey.

Q. Mr. Mickey.  Okay.  And one time did you go somewhere with Mr. Mickey and something happen[ed]?

[Objection sustained on the ground of compound question.]

Q. Do you remember ever going for a ride with Mr. Mickey?

A. No.

Q. Do you remember sometimes being with Mr. Mickey?

A. No.

* * *

Q. ***  [W]hen you rode in the car sometimes, who drove the car?

A. Mr. Mickey.

Q. Mr. Mickey.  Okay.  And one time when you rode in the car and Mr. Mickey was driving, did something happen while you were in the car?

A. I don't know.

Q. What does that mean?

A. No.

Q. ***  Do you remember taking a ride in the car with Mr. Mickey and somebody else?

A. Natalia.

* * *

Q. ***  [W]hen you and Natalia and Mr. Mickey were in Grandma's car, did something bad happen?

[DEFENSE COUNSEL]:  Objection, leading, Your Honor.

THE COURT:  Overruled.

A. I don't know.

* * *

Q. You don't know.  You don't know[,] or you don't want to tell me?

A. I just don't know.

Q. You don't know.  Okay.  After you took the ride with Mr. Mickey and with Natalia, was there something wrong?

A. I don't know.

Q. You don't know.  Did somebody in that car do something?

DEFENSE COUNSEL:  Objection, Your Honor, leading.

THE COURT:  Overruled.

A. I don't know.

Q. Did somebody in that car do something to hurt you?

[DEFENSE COUNSEL]:  Same objection.

THE COURT:  Same ruling.

A. I don't know."

The prosecutor asked that question two more times, with different wording, and each time received the same answer.  She asked:

"Q. Did you tell your mom some part of you is hurting?

A. Yeah.

THE COURT:  Which part?

THE WITNESS:  My bottom.

* * *

Q. Okay.  Did somebody hurt your bottom?

* * *

A. Yeah.

Q. Who was it that hurt your bottom?

A. I don't know."

After asking C.M. three times how that unnamed person had hurt her bottom and receiving three "I don't knows," the prosecutor handed C.M. a doll and told her to point to the doll's "bottom."  C.M. pointed to the vaginal area.  The prosecutor asked her:

"Q. [W]ho made that part hurt?

A. I don't know.

Q. Where were you when that part of you got hurt?

A. At [M]ommy's house.

Q. Mommy's house.  It was--it hurt when you were at your mommy's house?

A. (Whereupon the witness shook her head up and down.)

Q. And where were you before that part of you got hurt?

A. In my Grandma's car.

* * *

Q. ***  When your bottom got hurt somehow, who else was with you?

A. Natalia.

* * *

Q. ***  Did Natalia hurt you?

A. No.

Q. Well, who did hurt you then?

* * *

A. I don't know.

* * *

Q. ***  [W]ho was driving Grandma's car?

A. Mr. Mickey.

* * *

Q. *** [W]ho was it that did something to hurt your bottom?

A. I don't know.

* * *

Q. ***  Has [your bottom] been hurt lots of times or one time?

A. A lot.

Q. A lot.  It hurt a lot.  Can you tell the [j]udge just one time who it was that ever hurt your bottom?

* * *

A. Mr. Mickey.

Q. It was Mr. Mickey.  Okay.  And where was it?  Where were you when Mr. Mickey hurt your bottom?

A. I don't know."

The State called Robert Tarr, the physician who examined C.M. in the emergency room on November 12, 1999.  He found a rash in the "vaginal and rectal area diffusely"--a condition that, without any allegation of improper touching, he would have thought was caused by soap.  After he went back into the examination room at the urging of Shalores, he heard C.M. say, after "repeated questions," that "Mr. Mickey [had] touched her on the bottom."  

A nurse, Lisa Liss, testified that during Tarr's second examination of C.M., she saw "a redness to the vaginal area, and there was a very, very small open site, I guess you would say, like it was either a breakdown of skin or a laceration or tear.  But it was very, very small."

The social worker, Mary Beth Miller, could not recall whether she spoke with C.M.  

Nichols-Johnson testified she examined C.M. on November 18, 1999, to determine whether C.M. had been sexually abused.  She found two areas of irritation or redness near the introitus, on either side of the hymenal ring.  She opined the irritation was more likely caused by a finger than by soap or a urinary tract infection.  She asked C.M. if anyone had either touched or hurt her, and C.M. named "Mr. Mickey."  

Juan M. testified that his sister, Shalores, asked him to speak with C.M. and see if he could get her to tell him anything.  He asked Shalores "in reference to what," but Shalores "would not say."  The morning of November 13, 2001, he spoke with C.M. privately.  He described the conversation as follows:

"Q. And *** what did you talk to her about?

A. Nothing really specifically.  I asked her what she had done yesterday, and she said they had [ridden] around and visited Herb; and that was pretty much it.  And I asked her if anything was wrong, and she told me no.  And she--yeah, she said[,] [']I don't think so['] is what she told me."

The record does not seem to reveal who Herb was. 

Hopkins testified she and defendant had resided together since 1997.  She recalled that in late 1999, defendant received a call from the Department of Children and Family Services (DCFS) regarding an investigation of alleged child abuse.  He made an appointment to talk with the investigators.  Hopkins testified:

"After he got off the phone with the people from DCFS, he just shouted[,] [']Lord, get me out of this one[!']  And then *** I think it was a Saturday night before we went[.]  [W]e were [lying] in bed[,] and *** he said, ['Y]ou know, baby,['] he said, [']I think I really did something to hurt you.[']  And I asked him what it was[,] and he said[,] ['O]h, nothing.[']"

The trial court directed a verdict of acquittal on count I (penetration of the anus).

Defendant testified he had no recollection of telling Hopkins he had done anything to hurt her.  He denied removing C.M.'s clothing or touching her sexually or anywhere near her bottom.

II. ANALYSIS

A. Confrontation Clause

According to the rationale of 
Ohio v. Roberts
, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608, 100 S. Ct. 2531, 2539 (1980), quoting 
Mancusi v. Stubbs
, 408 U.S. 204, 216, 33 L. Ed. 2d 293, 303, 92 S. Ct. 2308, 2315 (1972), the confrontation clause of the sixth amendment (U.S. Const., amend. VI) allowed the admission of an unavailable witness's statement against a criminal defendant if the statement had "adequate 'indicia of reliability,'" 
i.e.
, the statement either fell within a "firmly rooted hearsay exception" or had "particularized guarantees of trustworthiness."  Defendant argues that because section 115-10 creates a new hearsay exception--one that is not "firmly rooted" in the common law--the confrontation clause requires that any hearsay admitted pursuant to the statute possess "'"particularized guarantees of trustworthiness"'" (
People v. Williams
, 193 Ill. 2d 306, 350, 739 N.E.2d 455, 478 (2000), quoting 
Idaho v. Wright
, 497 U.S. 805, 816, 111 L. Ed. 2d 638, 653, 110 S. Ct. 3139, 3147 (1990), quoting 
Roberts
, 448 U.S. at 66, 65 L. Ed. 2d at 608, 100 S. Ct. at 2539).

 After the parties filed their briefs in this case, the Supreme Court issued its decision in 
Crawford v. Washington
, 541 U.S. ___, ___, 158 L. Ed. 2d 177, 198, 124 S. Ct. 1354, 1369 (2004), which rendered the phrases "indicia of reliability" and "particularized guarantees of trustworthiness" irrelevant to the confrontation clause.  Regardless of "reliability," testimonial statements of witnesses absent from a criminal trial are admissible only if (1) the declarant is unavailable and (2) the defendant had an opportunity to cross-examine the declarant at the time of the statement (
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374)--cross-examination being the "'greatest legal engine ever invented for the discovery of truth'" (
California v. Green
, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935 (1970), quoting 5 J. Wigmore, Evidence §1367, at 29 (3d ed. 1940)).  Because this change in (or return to) constitutional doctrine enhances the truth-finding function of trials, 
Crawford
 applies retroactively.  See 
Williams v. United States
, 401 U.S. 646, 653, 28 L. Ed. 2d 388, 395, 91 S. Ct. 1148, 1152 (1971).

In the present case, C.M. testified at trial, and defendant cross-examined her.  "[W]hen the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements."  
Crawford
, 541 U.S. at ___ n.9, 158 L. Ed. 2d at 198 n.9, 124 S. Ct. at 1369 n.9, citing 
Green
, 399 U.S. at 162, 26 L. Ed. 2d at 499, 90 S. Ct. at 1937; see also 
United States v. Owens
, 484 U.S. 554, 560, 98 L. Ed. 2d 951, 958-59, 108 S. Ct. 838, 843 (1988); 
Delaware v. Fensterer
, 474 U.S. 15, 21-22, 88 L. Ed. 2d 15, 21, 106 S. Ct. 292, 295-96 (1985) (
per
 
curiam
); 
People v. Flores
, 128 Ill. 2d 66, 88, 538 N.E.2d 481, 489 (1989).

B. Hearsay

The confrontation clause and hearsay rules are designed to protect similar values, but the overlap is not complete.  
Green
, 399 U.S. at 155, 26 L. Ed. 2d at 495, 90 S. Ct. at 1933.  A violation of hearsay rules is not necessarily a violation of the confrontation clause or 
vice
 
versa
.  
Green
, 399 U.S. at 155-56, 26 L. Ed. 2d at 495-96, 90 S. Ct. at 1934.  For example, testifying to one's own or someone else's out-of-court statement can be hearsay, regardless of the declarant's presence in court (
People v. Lawler
, 142 Ill. 2d 548, 557, 568 N.E.2d 895, 899 (1991)), but if the defendant has an opportunity to cross-examine the declarant, the hearsay does not violate the confrontation clause (
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 197, 124 S. Ct. at 1369).  

Although the "reliability" test in 
Roberts
 and 
Wright
 is defunct as far as the confrontation clause is concerned (
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 199, 124 S. Ct. at 1370), it remains a part of the statutory exception to the hearsay rule (725 ILCS 5/115-10 (West 1998); 
People v. Peck
, 285 Ill. App. 3d 14, 23, 674 N.E.2d 440, 447 (1996)).  The child victim's hearsay statement is admissible under section 115-10(b)(1) only if "the time, content, and circumstances of the statement provide sufficient safeguards of reliability" (725 ILCS 5/115-10(b)(1) (West 1998)), a phrase we have interpreted as "incorporat[ing] the 
Wright
 criteria" (
Peck
, 285 Ill. App. 3d at 23, 674 N.E.2d at 447).  The State has the burden of proving reliability.  
People v. Zwart
, 151 Ill. 2d 37, 43, 600 N.E.2d 1169, 1171-72 (1992).   

Defendant contends that the "circumstances" of C.M.'s statement to Boston and Shalores lack "sufficient safeguards of reliability."  Keeping in mind that our standard of review is deferential (
Zwart
, 151 Ill. 2d at 44, 600 N.E.2d at 1172), we do not see how any reasonable trier of fact could find that the State carried its burden under section 115-10.  We are mindful of the Supreme Court's comment that "[r]eliability is an amorphous, if not entirely subjective, concept."  
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 200, 124 S. Ct. at 1371.  The concept becomes more definite and more meaningful to the extent that courts invest it with some rigor.  In light of Illinois decisions interpreting section 115-10, we do not believe one could reasonably find "sufficient safeguards of reliability" in the content and circumstances of C.M.'s statement to Shalores or in the circumstances of C.M.'s statement to Boston.

More than a year before Boston interviewed C.M., we put the State "on notice of the risk it takes by not recording interviews of alleged child victims."  
People v. Simpkins
, 297 Ill. App. 3d 668, 678, 697 N.E.2d 302, 308 (1998).  We held that the lack of such a verbatim recording could give cause for skepticism that the interview was free of "adult prompting or manipulation."  
Simpkins
, 297 Ill. App. 3d at 677, 697 N.E.2d at 308.  The State chose not to record C.M.'s interview.

Recording interviews is important because children, especially younger children, are "particularly susceptible" to suggestion by adults.  
Zwart
, 151 Ill. 2d at 45, 600 N.E.2d at 1172; see also J. Christiansen, 
The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews
, 62 Wash. L. Rev. 705, 711 (1987). 

Leading questions are, by definition, suggestive.  A "leading question" is one "that suggests the answer to the person being interrogated; espec[ially] a question that may be answered by a mere 'yes' or 'no.'"  Black's Law Dictionary 897 (7th ed. 1999).  "[A] suggestive manner of questioning by the witness to a hearsay statement (conduit of the statement) is a circumstance negating reliability of the statement."  
People v. Ware
, 259 Ill. App. 3d 466, 471, 631 N.E.2d 902, 905 (1994).  Leading questions can have varying degrees of suggestiveness.  T. Lyon, 
The New Wave in Children's Suggestibility Research:  A Critique
, 84 Cornell L. Rev. 1004, 1037-38 (1999).  Without a recording of Boston's interview of C.M., one cannot know whether her leading questions, either in their individual or collective potency, crossed the line into improper suggestion.  Boston herself admitted she could not remember many of the questions she asked C.M.  Some of the questions that she had written down were troubling in their focus on defendant:  "'I asked her if Mr. Mickey had done anything to her.  I asked if Mr. Mickey had touched her.'"  See 
Ware
, 259 Ill. App. 3d at 470, 631 N.E.2d at 904 ("Roberts repeatedly asked S.M.C.[,] '[W]hat did Todd do to you the other day?'")

Miller spoke with C.M. before Boston, and we have no record whatsoever of Miller's questions or C.M.'s answers.  Without any evidence of the substance of a previous interview, courts normally consider the circumstances of the subsequent interview to be unreliable.  See 
Zwart
, 151 Ill. 2d at 44, 600 N.E.2d at 1172; 
Simpkins
, 297 Ill. App. 3d at 677, 697 N.E.2d at 308. 

We recommend the recording of interviews because to assess the reliability of the circumstances under which the child made the statement, one must know what those circumstances are--including (as a rule) the questions that led to the statement.  Perhaps because the State waited a year and seven months to file a charge, Shalores could not remember the question that elicited C.M.'s statement to her in the bathroom.  Shalores had an uncertain memory of the statement itself.  Initially, she testified that C.M. had said "Mr. Mickey scratched her."  Later, on cross-examination, she admitted that C.M. had said the opposite:  that "Mr. Mickey wouldn't do it."  In a section 115-10 hearing, the issue is not whether the child actually made the statement; that issue is for trial.  
Ware
, 259 Ill. App. 3d at 472, 631 N.E.2d at 906.  As a practical matter, however, one cannot find "sufficient safeguards of reliability" in the "content" of an alleged hearsay statement (725 ILCS 5/115-10(b)(1) (West 1998)) unless one has a reasonably distinct idea of what that content is.  

If C.M. told Shalores that "Mr. Mickey wouldn't do it," one would naturally infer C.M. was responding to a suggestion:  either a question specifically naming defendant or an outright accusation of him.  Shalores, however, could not remember what she said to C.M. that prompted the statement.  In fact, Shalores testified she had "blocked a lot of this out."  Only through Shalores could the trial court have learned the circumstances of C.M.'s statement in the bathroom.  If Shalores "blocked a lot of [those circumstances] out," including the question that elicited the statement in the bathroom, we do not see how the court could have reasonably found those circumstances to be reliable.  For a court to deem the "circumstances" of a statement as providing "sufficient safeguards of reliability" (725 ILCS 5/115-10(b)(1) (West 1998)), those circumstances must surely, at a minimum, be available to the court.

The remedy for erroneous admission of hearsay is reversal unless the record clearly shows the error was harmless.  
People v. Bridgewater
, 259 Ill. App. 3d 344, 349, 631 N.E.2d 779, 782 (1994).  The error "is harmless only if properly admitted evidence is so overwhelming that no fair-minded trier of fact could reasonably have acquitted."  
Bridgewater
, 259 Ill. App. 3d at 349, 631 N.E.2d at 782.  

We do not find the properly admitted evidence to be overwhelming.  Tarr found no physical evidence of sexual abuse; Nichols-Johnson did.  C.M. told Juan nothing was wrong.  Defendant denied touching her.  Again and again at trial, C.M. testified she did not know who had hurt her bottom.  Only after the prosecutor repeatedly and laboriously directed her attention to "Mr. Mickey" did C.M. finally catch the hint and say "Mr. Mickey."  Such questioning could be considered suggestive.  Defendant's alleged "admission" to Hopkins was ambiguous.

III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and remand this case for a new trial.

Reversed and remanded.

COOK, J., specially concurs.

McCULLOUGH, J., dissents.

JUSTICE COOK, specially concurring:

I concur in the decision to reverse and remand.  Even assuming that section 115-10 has some continuing validity, the statements to Boston and Shalores lack "sufficient safeguards of reliability."  725 ILCS 5/115-10(b)(1) (West 1998); see 
People v. Cookson
, 335 Ill. App. 3d 786, 794-98, 780 N.E.2d 807, 813-16 (2002) (Cook, J., dissenting); 
People v. Barger
, 251 Ill. App. 3d 448, 469-73, 624 N.E.2d 405, 418-20 (1993) (Cook, J., specially concurring).  

I disagree, however, that section 115-10 has any continuing validity.  
Crawford
 was certainly critical of "sufficient safeguards of reliability" hearings.  
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 200, 124 S. Ct. at 1371 ("amorphous," "unpredictable," "demonstrated capacity to admit" statements that should be excluded).  We should not try to pick out pieces of section 115-10 that might survive 
Crawford
.  The legislature should decide whether it wants a new section 115-10, one which will be very different from the one it enacted.  

Section 115-10 may be summarized as follows.  The hearsay statement is substantively admissible whether or not the child testifies.  The only restriction is that the State must call the child as a witness, unless the child is "unavailable."  If the child is unavailable, there must be "corroborative evidence of the act."  In any case, there must be a section 115-10 hearing to establish "sufficient safeguards of reliability."  725 ILCS 5/115-10(b)(1) (West 1998).  
Crawford
 substantially undercuts section 115-10.  The admission of testimonial hearsay violates the confrontation clause even if the witness is legitimately unavailable, unless there was a prior opportunity for cross-examination.  
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.  The idea that "sufficient safeguards of reliability" are of some help is rejected.  
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 199, 124 S. Ct. at 1371.  Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the constitution actually prescribes:  confrontation.  
Crawford
, 541 U.S. at ___, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374.  Certainly the statements to the sheriff's detective and to Dr. Nichols-Johnson were testimonial hearsay, and their admission was prejudicial to defendant.     

Crawford
, 541 U.S. at ___ n.9, 158 L. Ed. 2d at 198 n.9, 124 S. Ct. at 1369 n.9, went on to hold that when the declarant appears for cross-examination at trial, the confrontation clause places "no constraints at all" on the use of his prior testimonial statements.  "The [c]lause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."  
Crawford
, 541 U.S. at ___ n.9, 158 L. Ed. 2d at 198 n.9, 124 S. Ct. at 1369 n.9.  C.M., who basically answered "I don't know" to every question asked her, did not appear for cross-examination in this case.  Placing a witness on the stand who is unable to understand what happened, cannot remember what happened, cannot understand the questions asked, or is unable to answer them does not afford an opportunity for cross-examination.        

Children's hearsay cases are unique.  In many such cases the effect of section 115-10 was to get the supposed testimony of an incompetent child before the trial court, often through the testimony of an interested witness who was given free rein to interpret what the child had said or done.  Under section 115-10, the child usually could not be cross-examined.  In 
Crawford
, in contrast, there were no concerns 
whether the statement had actually been made and there would have been no problem cross-examining the wife at trial and allowing her to defend or explain the statement. 

Did 
Crawford
 mean what it said, that the declarant must appear for cross-examination to defend or explain the hearsay statement?  Is it sufficient that a declarant who is unable to understand or answer questions is simply placed in the witness chair?  The issue was touched on in 
Green
, where a co-accused's testimony at preliminary hearing was admitted substantively, despite the fact that when called at trial he was evasive and uncooperative, claiming a lapse of memory.  The testimony was admitted, however, because defense counsel had been afforded (and exercised) a full opportunity to cross-examine at the preliminary hearing.  
Green
, 399 U.S. at 162, 26 L. Ed. 2d at 499, 90 S. Ct. at 1937.  
Green
 is no support for dispensing with cross-examination here.     

The majority justifies its decision to admit C.M.'s statements, despite her inability to testify, by citing some unusual cases, 
Owens
 (where the victim at trial could not remember the attack but could remember identifying the defendant to the police) and 
Fensterer
 (where an expert witness at trial could not remember some of the details of his expert opinion).  
Crawford
, of course, did not cite either one of these cases.  I disagree that the 
Crawford
 requirement is only illusory.  There is a difference between a lack of memory and an inability to testify.  A witness's concession that he has no memory of an event is often the very result of effective cross-examination.  
Flores
, 128 Ill. 2d at 90, 538 N.E.2d at 490, quoting 
Owens
, 484 U.S. at 561-62, 98 L. Ed. 2d at 959, 108 S. Ct. at 844.  The same cannot be said of an inability to testify.    

I have no quarrel with the proposition that the hearsay statement can be admitted so long as the declarant testifies, even though the declarant denies making the statement.  It is true that sometimes the probative value of the hearsay statement will greatly outweigh any statement made on cross-examination.  See 
Crawford
, 541 U.S. at ___ n.9, 158 L. Ed. 2d at 198 n.9, 124 S. Ct. at 1369 n.9 (discussing statements made by a cocon-spirator during the course of the conspiracy).  Nevertheless, when the declarant is subjected to cross-examination and is present to defend or explain the statement, the constitutional requirement is satisfied.  That did not happen here.     

JUSTICE McCULLOUGH, dissenting:

I respectfully dissent.  The trial court's finding of guilt beyond a reasonable doubt and the six-year sentence of imprisonment should be affirmed.

As stated by the majority, when a declarant is subject to cross-examination at trial, the confrontation clause places no restraints on the use of prior testimonial statements.  Defendant's objection that C.M.'s statement to Boston and Shalores lacks safeguards of reliability should not be the basis for reversing the trial court's judgment.

This was a bench trial.  The trial court made it clear that defendant would have the opportunity at trial to argue "the reliability of the statements [and] the weight to be given to those statements at the time of hearing" at trial.

The trial court made detailed findings concerning the testimony and arguments of counsel.  The findings do not refer to Shalores's testimony, and in reference to the statements of Boston, the court indicated that testimony was of little help.

The trial court found the testimony of nurse Liss to be persuasive.  The court stated:

"The testimony in this case necessarily starts with the testimony of [C.M.].  It is the opinion of the [c]ourt that in the context of her age and the amount of time that has passed since the offense occurred, the manner in which she testified and identified Mr. Miles was credible.  If that was the only testimony that I had heard, that would not have been sufficient to convict Mr. Miles beyond a reasonable doubt.  However, I am persuaded beyond a reasonable doubt that Mr. Miles did commit the offense charged in [c]ount II and the offense charged in [c]ount III.  And I am persuaded beyond a reasonable doubt.

There is credible testimony that Mr. Miles had the opportunity to be with this child on November 12th, 1999.  There is credible testimony that when she--when the child was returned to her home, her demeanor was different; that that evening she began to complain of an injury to what she characterized as her [']bottom[']; that she was, in fact, in a [
sic
] pain.  That pain was exacerbated by a bath that was given to her that night.

I did not find Dr. Tarr's testimony particularly persuasive.  I don't, quite frankly, think that he recalls what happened that night.

I was, however, very persuaded by Nurse Liss's testimony in several regards.  First, she clearly did remember that incident that night.  As an experienced emergency room nurse, she is sensitive to the problems that are created by coaching of children.  Her observation was that [C.M.] was not coached.  She heard [C.M.] identify the person known to her as a Mr. Mickey as the person who hurt her bottom.  At that time, the [c]ourt finds that there was no motive to warrant the conclusion that the child was coached into making that--those statements to Nurse Liss.

Parenthetically, I understand that those statements were repeated later to Leah Boston.  Again, if it was only the statements to Leah Boston, I would not be persuaded because of the method of examination that was conducted by Ms. Boston.  However, the method--it was not Ms. Boston who elicited the comments that I find to be most persuasive.  It was Nurse Liss who did that.

Those conclusions are further corroborated by Dr. Victoria Nichols-Johnson's testimony.  Based upon her examination on November 18th of 1999 which at that period of time found excoriation within the hymenal ring, and she, to any satisfaction, discounted other causes for that excoriation, her observation of excoriation is consistent with Nurse Liss's observation that she, in fact, on November, late hours of November 12th, early hours of November 13th, in the course of the second examination of [C.M.], observed a redness to the vaginal area where she saw a small open site, either a laceration or a tear.

The [c]ourt is further persuaded by Mr. Miles' statements to Trudy Hopkins, which the court concludes were statements of a recognition of a guilty conscious [
sic
].  The [c]ourt believes those statements were made.  The [c]ourt disbelieves Mr. Miles' statement that he--actually, all he said was that he doesn't remember having made those statements. The [c]ourt does believe that those statements were made, and the [c]ourt does believe that those were evidence of a guilty conscious [
sic
]."

The testimony of Boston and Shalores did little to help the trial court in its job as fact finder.  At the most, any asserted error as set forth by the majority was harmless.  This is especially true when put in context with the court's findings.

The trial court's judgment should be affirmed.