THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM D. CARTER, Defendant-Appellant.

Fourth District    No. 4—03—0167

Opinion filed December 22, 2005.—Rehearing denied February 10, 2006.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Jon Barnard, State's Attorney, of Quincy (Norbert J. Goetten, Robert J. Biderman, and Thomas R. Dodegge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In August 2002, a jury convicted defendant, William D. Carter, of

home invasion (720 ILCS 5/12—11(a)(1) (West 2000)). The trial court later sentenced him to 20 years in prison.

Defendant appeals, arguing that he was denied a fair trial in that (1) the trial court improperly admitted other-crimes evidence; (2) the court provided inadequate limiting instructions on the other-crimes evidence; and (3) a key part of the State's case was presented by stipulation, thereby violating his right to confront witnesses. We disagree and affirm.

## I. BACKGROUND

In December 2001, the State charged defendant with (1) aggravated criminal sexual assault (720 ILCS 5/12—13(a)(1), 12—14(a)(1) (West 2000)) and (2) home invasion (720 ILCS 5/12—11(a)(1) (West 2000)).

In July 2002, the trial court held hearings on *in limine* motions filed by both parties regarding the admissibility of other-crimes evidence. At the conclusion of those hearings, the court entered a written order granting and denying each party's motions in part and indicating precisely what evidence would be permitted.

At defendant's August 2002 jury trial, the following evidence was presented. Claiborne Parks testified that on December 17, 2001, he was living in a house located directly behind the residence of his landlord, Patricia Bizaillion. Early in the morning on that date, he heard glass breaking and then heard Bizaillion screaming and beating on his door. When Parks opened the door, he saw Bizaillion and two children. Bizaillion was hysterical and her neck appeared to be extremely red and irritated. She told Parks that someone was trying to kidnap or kill her and her children. Parks told a woman who was present in his residence (identified in the record only as "Marilyn") to call 9-1-1. Bizaillion asked Parks to go get her other children, and while he was on his way to Bizaillion's residence, he was met by police officers.

When a Quincy police investigator arrived at Bizaillion's residence on December 17, 2001, he saw a car with a smashed window. He went inside the residence and found it in a state of disarray. He saw items of women's underwear, a pillow, and a comforter on the floor. He found a handwritten note in the kitchen, which stated:

> "Mom and Dad. I went to Texas for Christmas. Have Jim Hammer do the clean up of the house and rent it out. Have Mr. Brown do the interview for renters. His number is 222-9360. I'll call you today. Please don't worry. Love Pat."

(The phone number contained in the note is the number of the Adams County 9-1-1 call center, and "Mr. Brown" was the police officer who took Bizaillion's earlier complaint on December 13, 2001.)

Bizaillion testified that she had known defendant for 10 years, and together they had had five children. (We discuss her testimony regarding her involvement with defendant prior to December 16, 2001, in our analysis of other-crimes evidence.) Bizaillion testified that on December 16, 2001, she put her children to bed around 9:30 p.m. About one-half hour later, she locked the doors and went to bed. She slept in an upstairs bedroom, in a bed with her four youngest children. Her oldest child, Ashley (who was nine years old at the time of defendant's August 2002 trial), slept downstairs. Sometime later, Bizaillion was awakened by defendant, who put his hand over her mouth and held a knife to her throat. He told her that if she made a sound or did not do everything he told her to do, he would kill her. He said, "I'll tell you what's going to go on tonight." He also told her that they were going to go to Texas. He was angry and said that he was going to regain his family.

Defendant told Bizaillion to get up because he wanted to go into another room where they could talk. He threatened to cut her throat if she made a sound. In another upstairs room, Bizaillion sat on the couch, and defendant apologized to her and said that he wanted his family back. He said that it was his duty to be a father and Bizaillion's duty to be a good wife, and she had not been a good wife.

Defendant put a blanket on the floor and told Bizaillion to lie down with him. She did what he told her, and he kissed her and touched her "all over." She did not consent and was afraid.

Several times, Bizaillion convinced defendant to let her go back to bed because one of the children had awakened and would wake up all the other children. Each time, defendant let her go back to bed for a short while, but then he returned to the bedroom and brought her out again. He removed her sweatpants and underpants and put his hand on and in her vagina. He attempted to have intercourse with her, but she squirmed and made up excuses, stating that they did not have birth control and she was afraid of the knife. Defendant also unsuccessfully attempted anal intercourse. At times, defendant held Bizaillion down by her arms and wrists. At one point, hoping to get help, Bizaillion suggested that they go to Wal-Mart to get birth control.

Bizaillion acknowledged that she did not see defendant's knife, although she felt it. It was a folding knife with a two- or three-inch blade. She heard him fold it up and put it in his pocket. She identified State's exhibit No. 15 as defendant's knife.

During her time with defendant, his "mood" shifted between being angry and wanting to reconcile their relationship. At one point, he accused Bizaillion of dating someone else.

Defendant told Bizaillion that they were going to go to Texas,

where he would protect her. He told her that things would change when they crossed the river. He then told her she had 15 minutes to wake up the children and get packed. Because Bizaillion knew that Parks would wake up at 5:30 a.m., she deliberately packed slowly. Eventually, she woke the children to prepare them to leave.

When Bizaillion woke Ashley and told her that defendant was there, Ashley became upset. Ashley started crying after defendant started "being very demanding." Defendant told Bizaillion that if she did not "get packing," he would do something in front of Ashley that Bizaillion would not want Ashley to see. When he said this, he patted his pants pocket, where his knife was.

Bizaillion tried to tell Ashley to call 9-1-1, but she failed to make Ashley understand, and defendant would not leave them alone. After that, defendant would not let Bizaillion out of his sight. He told Bizaillion to leave a note for her parents telling them that she and defendant had reconciled and were going to Texas. Unbeknownst to defendant, Bizaillion included in the note the aforementioned references to a police officer and the phone number of the local emergency call center.

Defendant told Bizaillion that he would slice her throat in front of all the children if she did not get in the car. After the children got in the car, Bizaillion locked defendant out of the car and repeatedly honked the horn. Defendant grabbed onto a partially open rear window and shook it, saying "I'm going to fucking kill you, you bitch," until the window broke. He grabbed Bizaillion's hair and tried to grab her shoulders. She managed to unlock the doors and told the children to run, which they did. Bizaillion and two of the children ran to Parks' residence. Bizaillion yelled and screamed that defendant was going to kill her. After Parks let her in, she begged him and Marilyn to call 9-1-1. She also begged Parks to get his gun and go get her other children. When the police arrived, the other children were at Bizaillion's residence, and defendant was gone.

An emergency-room nurse testified that when she spoke with Bizaillion on December 17, 2001, she appeared to be frightened and had an abrasion on her left wrist.

Quincy police investigator Mary Miller testified that around 3 p.m. on December 17, 2001, Monica Thompson, who was a close friend of Bizaillion, brought a duffle bag to the police station and turned it over to Miller. The bag had the name "Carter" on it, and its contents included a road atlas, items of clothing, a crowbar, and candy.

Upon stipulation of the parties, the trial court admitted in evidence the audiotaped recording of the 9-1-1 call made at 5:23 a.m. on December 17, 2001, from Parks' residence. The tape was played for the jury.

A Wheatland, Wyoming, police officer testified that when he arrested defendant on December 26, 2001, defendant had a folding knife with a two-inch blade in his pants pocket. The officer identified State's exhibit No. 15 as the knife he confiscated from defendant.

Defendant testified that when he was sentenced to probation on September 11, 2001, for violating an order of protection, the trial court did not order him to have no contact with Bizaillion; rather, the court ordered him not to harm or harass her. A few weeks later, Bizaillion gave defendant a key to her residence, and he moved in with her.

In early November 2001, Bizaillion asked defendant to move out, and he did. Defendant still had contact with Bizaillion and went to her house to pick up and drop off the children and do minor house repairs. He was trying to reconcile with Bizaillion and wanted to attend counseling with her. He called her once or twice a day.

When defendant went to Bizaillion's residence on December 13, 2001, she would not talk to him. The next day, a police officer arrived at defendant's motel and gave him a warning ticket.

Sometime between midnight and 1 a.m. on December 17, 2001, defendant arrived at Bizaillion's residence. He arrived in a taxi and had the driver let him out one block behind Bizaillion's residence because Bizaillion told him not to park his truck at her residence or let anybody see him go inside. He walked to the back of the residence and let himself in. Defendant saw that Ashley was alone in the bed on the main floor. He went upstairs and found Bizaillion in bed with the rest of the children and woke her up by touching her arm and shaking her a little bit.

Bizaillion got up, and they sat on the couch and talked. They hugged and kissed a couple of times. They discussed their options, and Bizaillion agreed to go to Texas with him. He acknowledged that Annie would occasionally wake up, and Bizaillion would lie down with her.

At some point, Bizaillion started to get her things together and then woke up Ashley. Then the whole family worked on getting ready to go and loading the car. They got everyone out to the car, but when defendant got around to the driver's side door, the door was locked, and Bizaillion started honking the horn.

Defendant then "blew up" because he "had the wool pulled over [his] eyes." Defendant acknowledged that he pulled the window out of the car and reached around to unlock the front door. He denied grabbing Bizaillion's hair, stating that his goal was to get into the car. As he got in, Bizaillion and the children were getting out, and it dawned on him that things had "blew [sic] apart."

Bizaillion screamed and ran to "the other house." Defendant saw

that Ashley hurt her foot, told Thomas to help her, and then walked to his truck, which was parked at the West Quincy truck stop. From there, he went to Texas.

Defendant acknowledged that he carried a pocketknife and had done so since he was about six years old. He denied taking it out of his pocket at any time that night. He did not talk about the knife or pat his pocket. He did not use force or threaten to use force. He denied using any threat of force to accomplish a sexual act. He also denied causing any bodily harm to Bizaillion.

The jury returned a verdict of not guilty on the charge of aggravated criminal sexual assault and guilty on the charge of home invasion. The trial court sentenced defendant as earlier stated.

This appeal followed.

## II. ANALYSIS

### A. Other-Crimes Evidence

Defendant first argues that he was denied a fair trial by (1) the improper admission of other-crimes evidence, and (2) insufficient limiting instructions pertaining to that evidence. We disagree.

### 1. *The Other-Crimes Evidence Presented at Trial*

After the trial court's July 2002 ruling on the parties' motions *in limine* regarding other-crimes evidence, Bizaillion testified that she and defendant had lived together, first in Texas and then Montana, for six years, until 1998. In May 1998, defendant pushed Bizaillion against a wall and told her he was going to kill her with his pocketknife. Bizaillion then left Montana and returned to Quincy, her hometown, where she moved into a house owned by her brother. She also hired an attorney and obtained an order of protection against defendant.

Bizaillion acknowledged that in the fall of 2000, she let defendant back into her life because she believed that if he lived in Illinois for six months, he would no longer be a Montana resident, and the Illinois courts would have jurisdiction to settle custody matters. While waiting for this six-month period to pass, Bizaillion permitted defendant to live with her for several months and she also gave him a key to her residence. She contended that during this time, she was "acting."

In March 2001, Bizaillion filed a petition in Illinois seeking custody of the children. In late March 2001, defendant phoned Bizaillion and threatened to kill her if she tried to keep him away from the children. Following that call, Bizaillion filed for an order of protection. In her attached affidavit, Bizaillion stated that she took defendant's threat seriously because he had "repeatedly held a knife to [her] throat." In April 2001, Bizaillion obtained an order of protection against

defendant. In August 2001, defendant violated that order of protection when he went to Bizaillion's residence and knocked on the door. In September 2001, defendant pleaded guilty to violating the order of protection and was later sentenced to probation. As a condition of probation, defendant was ordered not to "harm or harass" Bizaillion.

Bizaillion acknowledged that she allowed the order of protection to lapse and continued to allow defendant to see their children and stay with her. However, she urged him to establish his own residence, pay child support, and attend anger-management classes.

In November 2001, defendant filed a petition seeking visitation with their children. On November 29, 2001, Bizaillion told defendant not to come around and they would settle matters in court. On December 13, 2001, defendant came to Bizaillion's residence and was reluctant to leave. Bizaillion called police. Between November 29, 2001, and December 16, 2001, defendant sent Bizaillion flowers, left letters on her porch, phoned constantly, and followed her. (Bizaillion also testified that at some point during the couple's relationship, defendant had threatened to abduct their son Thomas.)

Quincy police officer James Brown testified that he responded to a call at Bizaillion's residence on December 13, 2001. He spoke with Bizaillion, and the next day, he issued defendant a warning ticket for trespassing, based on Bizaillion's complaint about defendant's harassment. While Brown was issuing the ticket, defendant admitted that he had been to Bizaillion's residence and had been trying to call her. Brown returned to the residence on several occasions in December 2001 and January and February 2002, to take further complaints of harassment. (Those complaints appear to have been in reference to harassment by telephone.)

Defendant complains of two categories of other-crimes evidence that were allegedly improperly admitted: (1) evidence of defendant's conduct, and (2) evidence of defendant's "court affairs." Included in the first group is the following evidence: (1) in May 1998, defendant pushed Bizaillion against a wall and threatened to kill her by cutting her throat; (2) defendant threatened to abduct Thomas and prevent Bizaillion from seeing him; (3) during a March 27, 2001, phone conversation, defendant threatened to kill Bizaillion; (4) defendant "had repeatedly held a knife to [Bizaillion's] throat"; (5) in August 2001, defendant violated an order of protection by going to Bizaillion's residence; (6) police found a crowbar in defendant's duffle bag that was left in Bizaillion's car on December 17, 2001; and (7) testimony regarding Officer Brown's returning to Bizaillion's residence several times in December 2001 and January and February 2002 following the December 17 incident, in response to further harassment.

Included in the second group is the following evidence: (1) in May 1998, Bizaillion obtained an order of protection against defendant; (2) in April 2001, Bizaillion obtained another order of protection; (3) on September 11, 2001, defendant pleaded guilty to violating the April 2001 order of protection; and (4) on October 30, 2001, defendant was placed on probation for violating the order of protection.

According to defendant, (1) none of the other-crimes evidence was relevant to whether he knew he was not welcome at Bizaillion's residence on December 17, 2001; (2) none of the orders of protection were in effect at the time of the incident; (3) defendant's probation did not bar him from Bizaillion's property; (4) none of the evidence showed a common design; (5) none of the evidence was relevant to defendant's intent; and (6) none of the evidence would demonstrate his intent to threaten or use force against Bizaillion.

### 2. When Other-Crimes Evidence Is Admissible

■ This court recently addressed the admissibility of other-crimes evidence in *People v. Spyres*, 359 Ill. App. 3d 1108, 835 N.E.2d 974 (2005). In that case, we explained the general rule as follows:

> "Generally, other-crimes evidence is inadmissible if it is relevant only to demonstrate a defendant's propensity to engage in criminal activity. [Citation.] Such evidence may be admissible, however, when it is relevant to show motive, intent, identity, absence of mistake or accident, *modus operandi*, or the existence of a common plan or design. [Citations.] Indeed, other-crimes evidence is admissible to prove any material fact other than propensity that is relevant to the case. *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003)." *Spyres*, 359 Ill. App. 3d at 1112, 835 N.E.2d at 977.

### 3. The Standard of Review

■ The admissibility of other-crimes evidence is left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion. An abuse of discretion occurs when no reasonable person would reach the same conclusion as the court or its decision is arbitrary or unreasonable. *Spyres*, 359 Ill. App. 3d at 1113, 835 N.E.2d at 978.

### 4. Forfeited Arguments as to Some Other-Crimes Evidence

■ The State contends that defendant, by his inaction, has forfeited his claims on appeal regarding the following other-crimes evidence: (1) defendant threatened to abduct Thomas and prevent Bizaillion from seeing him; (2) a crowbar was found in the duffel bag left at the scene; and (3) Brown made return visits to Bizaillion's residence to investigate further harassment by defendant. According to the State,

defendant did not challenge this evidence in a pretrial motion or object to its admission at trial.

Because the record shows that defendant (1) failed to raise a timely objection to this evidence and (2) fails to make any cogent argument that the plain-error rule should apply, we will not further consider defendant's arguments as to this evidence.

### 5. *The Trial Court's Ruling*

At the July 2002 hearing on the parties' motions *in limine*, the trial court was very careful in selecting which other-crimes evidence would be admissible and which would not. We note, for example, that while the court admitted the aforementioned other-crimes evidence, the court also barred some other-crimes evidence, including evidence (1) that defendant was keeping a rifle in his room at the Travel Lodge motel and (2) of several other incidents of domestic violence in which defendant injured Bizaillion. In making its ruling, the court explained as follows:

> "The fact-finding process and the truth-finding process cannot be short[ ]changed or shortcut to an outcome that is placed in a sterile environment of what happened within the few hours on the 17th of December, 2001, when there is a history here that is clearly relevant to a determination of the true facts of what took place on the date in question."

For the reasons that follow, we agree with the court's assessment and commend the court for taking the time to explain its decision in a written order, demonstrating the court's careful attention to sorting through the evidence and crafting a careful ruling.

### 6. *The Continuing-Narrative Exception to the Rule Against Other-Crimes Evidence*

■ Defendant contends that although some of the contested evidence may have shed light on his relationship with Bizaillion, there is no exception to the general rule against other-crimes evidence based on "relationship." Although we agree with defendant that there is no "relationship" exception as such, other-crimes evidence remains admissible to prove any material fact other than propensity to commit crime (*Spyres*, 359 Ill. App. 3d at 1112, 835 N.E.2d at 977), such as when it constitutes a continuing narrative of the circumstances attending the entire transaction (*People v. Thompson*, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005)).

In *Thompson*, 359 Ill. App. 3d at 951, 835 N.E.2d at 936, this court recently explained the continuing-narrative exception to the rule against other-crimes evidence, as follows:

> "This court has specifically recognized evidence of another crime

is admissible if it is part of a continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged. *People v. Harper*, 251 Ill. App. 3d 801, 804, 623 N.E.2d 775, 777 (1993); see also *People v. Lewis*, 243 Ill. App. 3d 618, 625-26, 611 N.E.2d 1334, 1339 (1993) (other-crimes evidence is admissible where it relates to the events that led to the charged offense). As this court has explained, '[w]hen facts concerning uncharged criminal conduct are all part of a continuing narrative which concerns the circumstances attending the entire transaction, they do not concern separate, distinct, and unconnected crimes.' *People v. Collette*, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991)."

As Justice Hoffman explained in *People v. LeCour*, 273 Ill. App. 3d 1003, 1008, 652 N.E.2d 1221, 1226 (1995), other-crimes evidence is admissible if material for any purpose other than to show propensity to commit crime, such as "to explain an aspect of the crime charged which would otherwise be implausible." The *LeCour* court further explained that "[o]ther[-]crimes evidence bears not merely upon who committed the crime, but upon whether the crime was committed at all." *LeCour*, 273 Ill. App. 3d at 1009, 652 N.E.2d at 1226.

■ Judged in accordance with these cases, we conclude that the continuing-narrative exception applies to the admission of the other-crimes evidence at issue here because, without that evidence, some of the conduct engaged in by both defendant and Bizaillion would be implausible or perhaps even inexplicable. As the trial court noted, without this other-crimes evidence, the fact-finding process would be shortchanged because the jury would be limited to considering "a sterile environment of what happened within the few hours on the 17th of December, 2001, when there was a history here that is clearly relevant to a determination of the true facts of what took place on the date in question."

We find support for our conclusion that the other-crimes evidence here was admissible in this court's decision in *People v. McFarland*, 259 Ill. App. 3d 479, 631 N.E.2d 746 (1994). In that case, the defendant was charged with aggravated battery on a public way for striking a 15-year-old girl as she stood in a parking lot. The victim testified at trial that before the defendant struck her, he told her that she could not stand where she was standing unless she was " 'with him.' " The trial court allowed the victim to testify that on an earlier occasion, the defendant had asked her to sell drugs for him. *McFarland*, 259 Ill. App. 3d at 480-81, 631 N.E.2d at 747. This court held that this other-crimes evidence was properly admitted because it "set the stage for the confrontation" between the victim and the defendant, and without

this testimony, the victim's version of events "might appear improbable because of the absence of any motive" on the defendant's part to strike her. *McFarland*, 259 Ill. App. 3d at 481, 631 N.E.2d at 747-48. Although we did not use the term "continuing narrative" to explain why the other-crimes evidence in *McFarland* was admissible, we now recognize that this exception to the rule against such evidence was the basis of our holding.

We acknowledge that in the usual case in which the continuing-narrative exception has been applied, the time between the alleged offense for which the defendant is standing trial and his commission of the other crimes at issue has usually been short. See, for instance, *Collette*, 217 Ill. App. 3d at 472, 577 N.E.2d at 555 (a few minutes); *Harper*, 251 Ill. App. 3d at 803-04, 623 N.E.2d at 777 (a few minutes); *Thompson*, 359 Ill. App. 3d at 951-52, 835 N.E.2d at 935-36 (a few minutes); *Lewis*, 243 Ill. App. 3d at 625-26, 611 N.E.2d at 1339-40 (a case in which the other crimes—which the appellate court deemed intertwined with the offense on trial—occurred a few hours earlier). However, the short time span in these cases was coincidental. It is not a requirement before this exception can apply. See, for instance, *McFarland*, 259 Ill. App. 3d at 481, 631 N.E.2d at 747-48 (a few weeks); *LeCour*, 273 Ill. App. 3d at 1008-09, 652 N.E.2d at 1225-26 (two incidents occurring five to six weeks before the offense on trial).

*McFarland* and *LeCour* demonstrate that although this exception to the rule against other-crimes evidence is commonly referred to as the continuing-narrative exception, a more apt name might be the "coherent-narrative exception." See American Heritage Dictionary 259 (1975) (defining "coherent" as "Marked by an orderly or logical relation of parts that affords comprehension or recognition"). In this case, *McFarland*, and *LeCour*, the other-crimes evidence was not part of a continuous narrative of the facts surrounding the charged offense. Rather, it furnished a back story that made the immediate evidence of the charged crime coherent and understandable. Although this other-crimes evidence reached further back in time than the evidence in *Collette*, *Harper*, *Thompson*, and *Lewis*, it was no less essential to providing the fact finder with a plausible version of events. Accordingly, we hold that the temporal link between other-crimes evidence and evidence of the immediate offense is but one of several factors for the trial court to consider as it exercises its discretion to determine whether the continuing-narrative exception applies in a given case.

### 7. The Probative Value of the Other-Crimes Evidence Versus Its Prejudicial Effect

Defendant contends that even if the other-crimes evidence was

relevant, its probative value was outweighed by its prejudicial impact. We disagree.

"Whether the probative value of other-crimes evidence is outweighed by its prejudicial impact is a determination left to the trial court's discretion, and we will not disturb that decision absent a clear abuse of discretion." *Spyres*, 359 Ill. App. 3d at 1114, 835 N.E.2d at 979. The trial court was in the best position to weigh the prejudicial impact of the other-crimes evidence in the context of the entire case. Reviewing the court's decision under the appropriate standard, we conclude that the court did not abuse its discretion by determining that the probative value of the other-crimes evidence was not outweighed by its prejudicial effect.

### 8. *The Limiting Instruction on Other-Crimes Evidence*

■ Defendant next contends that he was deprived of a fair trial because the trial court did not provide the jury with sufficient limiting instructions on the other-crimes evidence. We disagree.

The record shows that the trial court gave the following instruction on other-crimes evidence, along with all of its other instructions:

> "Evidence has been received that the [d]efendant has been involved in conduct other than that charged in the information. This evidence has been received on the issues of the relationships of the parties, the [d]efendant's intent, knowledge[,] and design, and may be considered by you only for that limited purpose. It is for you to determine whether the [d]efendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of the relationship of the parties, the [d]efendant's intent, knowledge[,] and design."

See Illinois Pattern Jury Instructions, Criminal No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th).

We initially reject defendant's claim that this instruction was improper because the other-crimes evidence was not admitted to show evidence of a common design. As this court held in *Spyres*, " '[W]hen jurors receive a limiting instruction that permits them to consider evidence for a number of reasons, and one of those reasons is determined on appeal to be improper, judgment of conviction must be affirmed despite the overly broad instruction.' " *Spyres*, 359 Ill. App. 3d at 1115, 835 N.E.2d at 979-80, quoting *People v. Jones*, 156 Ill. 2d 225, 240, 620 N.E.2d 325, 330 (1993).

Nevertheless, defendant raises a valid concern when he complains that the trial court failed to give a limiting instruction when the other-crimes evidence was presented to the jury.

In *People v. Denny*, 241 Ill. App. 3d 345, 360-61, 608 N.E.2d 1313, 1324 (1993), this court encouraged trial courts to instruct the jury in

accordance with IPI Criminal 4th No. 3.14 orally from the bench when the evidence is first presented. In *People v. Heard*, 187 Ill. 2d 36, 60-61, 718 N.E.2d 58, 72 (1999), the Supreme Court of Illinois cited *Denny* approvingly when it wrote: "The better practice may be for trial courts to instruct the jury, not only at the close of the case, but also at the time other-crimes evidence is admitted, of the limited purpose for which it may consider the other-crimes evidence." However, the supreme court further held that the trial court's failure to do so does not mandate reversal. *Heard*, 187 Ill. 2d at 61, 718 N.E.2d at 72. The same conclusion applies to this case. Thus, while the better practice is to give a limiting instruction when the other-crimes evidence is presented (and we applaud the trial court for suggesting to counsel at the *in limine* hearing that a contemporaneous limiting instruction should be given), the court's failure to give such an instruction does not warrant reversal.

### B. The Stipulation Regarding the Audiotape of the 9-1-1 Call

■ Defendant next argues that he was denied a fair trial when the audiotape of the 9-1-1 call was presented by stipulation, thereby violating his right to confront witnesses. Specifically, he contends that nothing in the record indicates that (1) defense counsel spoke with him about the stipulation and (2) counsel's decision to stipulate was a matter of legitimate trial tactics or strategy. Defendant contends that this audiotape, which consisted initially of Marilyn's voice describing the need for police assistance and then Bizaillion's voice, was an "explosive, raw, emotion-laden" recording of this phone call. Defendant asserts that this recording did not merely corroborate the testimony of the State's witnesses, but "added another dimension to the prosecution's case."

The State initially responds by claiming that defendant's confrontation-clause rights were not implicated by the admission of the audiotape because Bizaillion testified at trial, thereby satisfying defendant's right to confrontation. Although this contention is correct regarding Bizaillion (see *People v. Miles*, 351 Ill. App. 3d 857, 864, 815 N.E.2d 37, 44 (2004) (" '[w]hen the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements' "), quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9, 158 L. Ed. 2d 177, 198 n.9, 124 S. Ct. 1354, 1369 n.9 (2004); see also *People v. Sharp*, 355 Ill. App. 3d 786, 792, 825 N.E.2d 706, 711 (2005) (when a witness "appears" for cross-examination by being present at cross-examination and answering counsel's questions, the confrontation clause places no restraints on the use of the witness' prior statements)), it is not cor-

rect as to Marilyn, the woman who made the 9-1-1 call from Parks' residence, and who never testified at trial.

Defendant's claim is based upon the decision of the Third District Appellate Court in *People v. Phillips,* 352 Ill. App. 3d 867, 817 N.E.2d 566 (2004), *appeal allowed,* 213 Ill. 2d 571 (2005) (*Phillips II*). In that case, the defendant was charged with several drug offenses. At her trial, the prosecutor and defense counsel stipulated to the admission in evidence of laboratory reports establishing the identity and weight of the drugs at issue. The laboratory technician who tested and weighed the drugs did not testify at the defendant's trial, but the record contained no showing that she objected to the admission of the lab reports by stipulation. *Phillips II,* 352 Ill. App. 3d at 868, 817 N.E.2d at 568. The Third District initially affirmed the defendant's conviction, rejecting her claim that the admission of the stipulation violated her right of confrontation. *People v. Phillips,* 326 Ill. App. 3d 157, 759 N.E.2d 946 (2001) (*Phillips I*). However, in *People v. Phillips,* 208 Ill. 2d 550, 804 N.E.2d 1066 (2004), the Supreme Court of Illinois vacated that decision and remanded the cause to the Third District to reconsider its judgment in light of the supreme court's decision in *People v. Campbell,* 208 Ill. 2d 203, 802 N.E.2d 1205 (2003). On remand, the Third District reversed the defendant's conviction, explaining as follows:

"Construing the fundamental constitutional right [of confrontation] in conjunction with the supreme court's decision in *Campbell,* we conclude that in order to waive the defendant's sixth amendment right of confrontation by stipulating to the admission of evidence, there must be some affirmative showing or indication by the defendant in the record that he or she did not object to or dissent from the attorney's decision to stipulate. ***

*** [T]he requirement of a voluntary, knowing[,] and intelligent waiver is inherent in defendant's *election* not to object to stipulating and *** there needs to be some evidence in the record that defendant knowingly waived [his right to confrontation]. That is to say[,] that he or she was advised of the right to confront witnesses and of the nature and legal impact of waiving that right through the proposed stipulation, and either concurred with or objected to it." (Emphasis in original.) *Phillips II,* 352 Ill. App. 3d at 871, 817 N.E.2d at 570-71.

The Third District then considered the record before it in light of its interpretation of *Campbell* and concluded as follows:

"[A] review of the record in the present case discloses nothing that demonstrates (or even suggests) that the attorney explained to [the defendant] what decisions were generally made by him absent her objection or, more specifically, what a stipulation is and its legal

impact, what he intended to stipulate to, and what the implications were of stipulating to the specific data in the lab reports." *Phillips II*, 352 Ill. App. 3d at 872, 817 N.E.2d at 571.

Recently, however, the Supreme Court of Illinois reviewed the Third District's *Phillips II* decision and reversed it. In *People v. Phillips*, 217 Ill. 2d 270, 288 (2005), the supreme court explained that action as follows:

"In sum, it is not necessary for either the court or counsel to admonish a defendant about the implications and consequences of a stipulation, and defendant's explicit agreement to the stipulation on the record is not required where, as here, (1) defense counsel's decision to stipulate appears to have been a matter of trial tactics and strategy and defendant does not object to counsel's decision, and (2) the State's entire case is not presented by stipulation, the defendant *does* present or preserve a defense, and the stipulation does not include a statement that the evidence is sufficient to convict." (Emphasis in original.)

Analyzing the stipulation here in accordance with the foregoing standards, we conclude that (1) defense counsel's decision to stipulate appears to have been a matter of trial tactics and strategy and defendant did not object to counsel's decision, and (2) the State's entire case was not presented by stipulation, the defendant did present a defense, and the stipulation does not include a statement that the evidence is sufficient to convict.

Regarding the issue of trial tactics, we note that defense counsel reasonably could have determined that the State would be able to satisfy the foundational requirements for the audiotape's admission and thus objecting to it would be fruitless. See *People v. Edwards*, 195 Ill. 2d 142, 165, 745 N.E.2d 1212, 1225 (2001) ("[c]ounsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection"). Further, defense counsel might have believed that objecting to the audiotape would simply have forced the State to call Marilyn, who did not otherwise testify at trial. Her live testimony might have proved more powerful—and more damaging to defendant—when she related how Bizaillion appeared on the night in question (hysterical and physically abused) than did her audiotaped statement.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER and APPLETON, JJ., concur.